Marion H. MORRIS et al., Appellants,

v.

Major General William T. McCADDIN
et al., Appellees.

No. 76–1772.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1977.

Decided April 21, 1977.

E. D. David, Newport News, Va. (Jones, Blechman, Woltz & Kelly, Joe S. Frank, Frank, Nachman & Frank, Newport News, Va., on brief), for appellants.

James K. Jackson, Office of the Judge Advocate Gen., Dept. of the Army, Washington, D.C. (William B. Cummings, U. S. Atty., Alexandria, Va., and Michael A. Rhine, Asst. U. S. Atty., Norfolk, Va., on brief), for appellees.

Before WIDENER and HALL, Circuit Judges, and WYZANSKI, Senior District Judge.*

K. K. HALL, Circuit Judge:

Eighteen plaintiffs filed suit in federal court alleging that certain actions taken by defendants violated statutes, regulations and directives of the United States regarding a reduction in force (hereinafter "RIF") in the Nike-Hercules Missile Program in the Commonwealth of Virginia. All plaintiffs are members of the Virginia Army National Guard and were employees in that missile program. The defendants are the Adjutant General of the Virginia National Guard, the Secretary of Defense, the Secretary of the Army, and the Chief of the National Guard Bureau. The district court refused the relief sought on the basis that the Virginia Adjutant General acted within his discretionary authority in effecting the RIF. We reverse.

I.

The plaintiffs were employed in the air defense Nike-Hercules program pursuant to the National Guard Technicians Act of 1968, 32 U.S.C. § 709, a program existing in ten states within the United States. On February 4, 1974, the Department of Defense announced the country-wide elimination of the Nike-Hercules program by September 30, 1974. At the time of that announcement there were three Nike-Hercules Missile sites in Virginia[1] employing 291 technicians whose jobs would be abolished. The plaintiffs' duties basically were to care for, operate and maintain in a state of readiness the missile sites and the related equipment.

In preparation for the RIF, the Adjutants General of the affected states were called to Washington, D. C., and given general guidance concerning the reduction. A booklet was distributed which referred to Technician Personnel Pamphlet 910 (hereinafter TPP 910), a publication issued by the National Guard Bureau on March 1, 1973, pursuant to 32 U.S.C. § 709. TPP 910 was promulgated to provide guidance to states conducting a RIF. The Washington meeting and the explanatory booklet distributed at that meeting collectively and clearly expressed the National Guard Bureau's intention regarding the RIF: "It is the intent . . . that *every effort* be taken to retain career Reservist/Technicians in the program." (emphasis added). Additional funding was made available in order to reassign air defense technicians.

Prior to the Washington meeting, the state National Guard units had been operating at less than the full personnel capacity because of a lack of funding for remaining authorized positions. The state Adjutants General were informed at the Washington meeting that the affected states were "authorized to reassign Air Defense technicians up to 100% of all existing positions on current manning documents for each activity." (i. e., appropriations were authorized to create more openings in the National Guard, boosting its membership to full capacity). This created 115 positions in Virginia.

* Sitting by designation.

1. The sites in Virginia were: Newport News, Chesapeake and Lorton.

They also were instructed to follow the procedures outlined in TPP 910 in order to provide *maximum* placement assistance and retention of the displaced technicians.[2]

The National Guard Bureau issued numerous bulletins to supplement TPP 910. They stated clearly that TPP 910 was to be utilized to the fullest extent to give preferential treatment to those technicians faced with loss of their jobs. In these bulletins the states were told:

1. To identify all existing vacancies which could be filled by the displaced technicians and forward that list to the National Guard Bureau for dissemination among the ten air defense states;

2. That funds would be allocated in order to accept the transfer of "those Air Defense Technicians who might otherwise be eliminated from the program;"

3. That each state will implement those policies and procedures outlined in TPP 910;

4. That funds would be "authorized to reassign . . . [t]echnicians up to 100% of all existing positions . . . [in order to] provide for an opportunity for relocation of many of the affected technicians."

## II.

Following the directives discussed above, General McCaddin, the Adjutant General of the Virginia National Guard, embarked upon a program designed to carry out TPP 910. The inactivation notice was given on February 4, 1974, but the men were assured that "every effort will be made to place the 291 Air Defense Technicians in positions." General McCaddin explained that he had been authorized 100% technician manning to be utilized in placing the affected technicians. Subsequent similar verbal assurances were given, the technicians were notified that there would be a complete and immediate freeze regarding all promotions, transfers, reassignments and new hires, and it was announced that pursuant to TPP 910,

a placement program would be implemented.

However, a complete "about-face" was announced sixteen days after the inactivation notice. In a directive dated February 21, 1974, all pertinent provisions of the prior directives were rescinded and the freeze was discontinued. Instead of a preferred placement plan as contemplated by TPP 910 and the National Guard Bureau Bulletins, Virginia embarked on a merit promotion program. The displaced technicians were then forced to compete with non-affected technicians for vacancies. The merit promotion scheme which was utilized was one of four suggestions made by the National Guard Bureau. This change in policy resulted from meetings and consultations by General McCaddin and Wayne A. Robertson, Chief of Office Technician Personnel of the National Guard Bureau. They felt that the merit promotion plan would obviate morale problems with the remainder of the Virginia National Guard, and the Virginia National Guard would suffer less in the long run.[3]

While the defendants assert that the merit plan was successful, the record discloses disastrous results. Of 291 displaced technicians only 77 were retained in the Virginia National Guard; 40 found positions in other states' guard programs; 74 relocated in other federal agencies; 13 retired; 2 entered active military service; and 85 resigned or were separated from the Guard. Moreover, 291 men knew on February 4, 1974, that if they had not been employed by September 30, 1974, (completion date of the RIF), they would be out of a job; but it took over three months for Virginia to guarantee the first job. With 8 days remaining in the RIF, only 22 men out of 291 had found a job in the National Guard.

On these facts, plaintiffs filed suit in the United States District Court for the Eastern District of Virginia, Newport News Division. The district court denied the relief

---

2. Clearly, the guiding star initially announced by the National Guard Bureau and declared in TPP 910 was that in effecting the RIF, the displaced technicians would be cared for first.

3. After completion of the merit promotion competition, the placement program as contemplated by TPP 910 was utilized for one day only.

sought. This appeal followed. Plaintiffs maintain that the lower court erred in holding that the Adjutant General acted within his discretionary authority in using merit promotion competition and argue that the defendants failed to follow TPP 910.

### III.

We agree with the plaintiffs' contention that General McCaddin abused his discretion in not following TPP 910.

Title 32 U.S.C. § 709(e)(4) provides:

(e) Notwithstanding any other provision of law and under regulations prescribed by the Secretary concerned . . .

(4) . . . a reduction in force . . . shall be accomplished by the adjutant general of the jurisdiction concerned;

. . .

In this case TPP 910 is the applicable and only secretarial regulation. While we agree with the district court that "the language in TPP 910 does not relegate the Adjutant General to a purely ministerial task of implementing its provisions in a perfunctory fashion," nevertheless, the Adjutant General must not lose sight of the main thrust of this regulation either.

Under the chapter "GENERAL," TPP 910 provides:

A RIF is an extremely sensitive area of technician-management relations. The technician affected is faced with the possible loss of his livelihood and his capability to support his family. He faces an uncertain future, and the reduction of these uncertainties is deserving of top management's personal attention. Mere adherence to RIF regulations or procedures does not provide for a sound program and does not take into consideration the human aspect of the problem. *The technician must be assured that every effort humanly possible will be made to assist him in continuing employment.* . . . It is required that a meeting be arranged with the *technicians affected* and a *clear and intensive placement program be outlined.* . . . (emphasis added).

In chapter 2 of TPP 910, under the heading of "2–1. Obligations beyond requirements," discretionary language is included with the primary theme of the regulation:

The obligation to provide maximum placement assistance [to displaced technicians] does not end with adherence to the minimum requirements set forth in regulations and procedures.

Chapter 5 of TPP 910 deals with the scope of competition among the displaced technicians:

When a RIF is planned, the Technician Personnel Officer, acting on behalf of the State Adjutant General, should establish step-by-step actions to be taken to ensure maximum retention of the displaced technicians.

The Technician Personnel Officer should fill authorized vacancies . . .

The Technician Personnel Officer should establish the following four rounds of competition among the affected technicians. . . .

TPP 910 emphasizes a placement program; competition is discouraged except, as a last resort:

2–4. Placement program results. A positive placement program will reduce or eliminate the necessity to execute a program of competition among technicians.

. . .

■ The plaintiffs' main objection is that the displaced air defense technicians were mandated to be placed in the 115 positions opened under the 100% manning authorization and that the rest of the technicians in the Virginia Guard should not have been allowed to compete for those positions. In keeping with the primary purpose of applicable regulation, we agree. To assure "maximum retention" of the displaced technicians, *all* authorized vacancies must be made available to this class only, and competition must be restricted among the same.

■ As evidence of the primary purpose of TPP 910 as it related to the 115 job vacancies, we examine its objective as viewed by Major General Francis S. Greenlief, Chief of the National Guard Bureau.

In a letter of August 16, 1974, two weeks after his retirement, General Greenlief replied to an inquiry. He confirmed his prior directive in January of 1974 that the states conducting the RIF "could fill previously unfunded positions up to 100% authorized manning *provided they filled these positions with Air Defense Technicians who were to be eliminated.*" (emphasis added). While not dispositive, the statement by the Chief of the National Guard regarding his interpretation of TPP 910 while in office is accorded great weight. Robertson, who authorized McCaddin's actions, is considered the expert in the Guard's technician personnel matters; however, he was subordinate to General Greenlief. Robertson had no authority on his own to change the requirements of TPP 910, an established regulation upon which the technicians had a right to rely.[4]

■ The freeze should have continued for the full duration of the RIF. The elimination of an entire national guard program was unique in effecting this RIF; however, this is no defense for non-compliance with TPP 910. The sixteen-day freeze on all promotions, transfers, reassignments and new hires was insufficient. Such a freeze is to be implemented in the planning stages of the RIF (section 5–1, TPP 910), but to comply with the obvious purpose of TPP 910, the freeze must be more than nominally evoked.

### IV.

■ From our examination of the record as a whole, we hold that the district court's findings are not supported by substantial evidence. We think the finding that defendants did not abuse their discretionary authority is clearly erroneous, and the judgment below must be reversed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Taylor v. Local No. 7, Inter. U. of Journeymen Horseshoers,* 353 F.2d 593, 601

(4th Cir. 1965), *cert. denied,* 384 U.S. 969, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966); *Smith v. United States,* 336 F.2d 165, 168 (4th Cir. 1964).

■ Failure to effectively follow TPP 910 constituted an abuse of discretion. The defendants were obligated to follow their own regulation. The rule is well established that: "An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir. 1969), *citing United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) and other cases. *See also McCourt v. Hampton,* 514 F.2d 1365, 1370 (4th Cir. 1975); *Cross v. United States,* 512 F.2d 1212, 1218 n. 9 (4th Cir. 1975).

### V.

With the reversal, we remand this case to the district court for entry of an appropriate order directing the defendants to prepare a schedule, subject to the court's approval, offering employment or reemployment to plaintiffs at no less than the grade each would have had if the competition for vacancies had been restricted to the displaced technicians in accordance with TPP 910. However, the United States will not be required to pay plaintiffs for wages lost due to failure to receive jobs as they were entitled, nor will defendants be held individually liable.

### VI.

■ Regarding the district court's denial of plaintiffs' motion to proceed as a class, we hold that the court did not abuse its discretion. We agree with the district court that the interests of the named plaintiffs would have been antagonistic to the interests of many of the unnamed members of

---

4. The record is not clear as to the method utilized by the other nine states conducting the RIF. Defendants say they used a scheme similar to that employed in Virginia, or that scheme in conjunction with other procedures. We are not apprised of their success in retaining technicians affected by the RIF.

the class, *Phillips v. Klassen,* 163 U.S.App. D.C. 360, 502 F.2d 362, 365–68 (1974), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974), and accordingly class action certification in this case would have been inappropriate.

*REVERSED AND REMANDED IN PART WITH DIRECTIONS; AFFIRMED IN PART.*