[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 14, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-10171

_____

D.C. Docket No. 99-01317 MD-PAS

VALLEY DRUG COMPANY,
LOUISIANA WHOLESALE DRUG CO., INC.,

Plaintiffs-Appellees,

SHERMAN ACT CLASS PLAINTIFFS,

Consolidated-
Plaintiff-Appellee,

WALGREEN CO., INC.,
DRUG MART PHARMACY CORP.,
et al.,

Plaintiffs,

HY-VEE, INC., from 99cv1938,
STOP & SHOP SUPERMARKET CO., from
99cv1938 et al.,

Consolidated-
Plaintiffs,

versus

GENEVA PHARMACEUTICALS, INC.

                                                    Defendant,

ZENITH GOLDLINE PHARMACEUTICALS, INC.,

                                                    Defendant,

ABBOT LABORATORIES,

                                                    Defendant-
                                                    Consolidated-
                                                    Defendant-Appellant.

NOVARTIS PHARMACEUTICALS CORPORATION,
IVAX PHARMACEUTICALS, INC.,
f.k.a. Zenith Goldline Pharmaceuticals, Inc.,

                                                    Consolidated-
                                                    Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(November 14, 2003)

Before TJOFLAT, and ANDERSON, Circuit Judges, and STAFFORD[*], District
Judge.

TJOFLAT, Circuit Judge:

This case, which involves intersecting questions of antitrust law and class

action procedure, comes to us on appeal from the United States District Court for

the Southern District of Florida.  Louisiana Wholesale Drug Co. ("Louisiana

_____

[*]Honorable William H. Stafford, Jr., United States District Judge for the Northern District
of Florida, sitting by designation.

2

Wholesale") and Valley Drug Co. ("Valley Drug") allege that the defendant Abbot Laboratories ("Abbot"), violated section 4 of the Clayton Act, 15 U.S.C. § 15[1], and section one of the Sherman Antitrust Act, 15 U.S.C. § 1[2], when it entered into settlement agreements with defendants Geneva Pharmaceuticals, Inc., ("Geneva") and Zenith Goldline Pharmaceuticals, Inc. ("Zenith") because the effect of the agreements was to preserve Abbot's monopoly position in the market for the drug terazosin hydrochloride by keeping Geneva and Zenith's less expensive generic terazosin products off the market. The plaintiffs sought class certification for their antitrust claims under Rule 23(b)(3)[3] of the Federal Rules of Civil Procedure, and on September 20, 2001, the district court granted the plaintiffs' consolidated motions. In re Terazosin Hydrochloride Antitrust Litigation, 203 F.R.D. 551 (S.D.

---

[1] Section 4 of the Clayton Act provides in relevant part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. 15 U.S.C. § 15(a).

[2] Section 1 of the Sherman Act provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. 15 U.S.C. § 1.

[3] The text of Rule 23(b)(3) is quoted in this opinion at infra, n.13.

3

Fla. 2001).[4]  Pursuant to Rule 23(f)[5], we permitted Abbot and Zenith to appeal the district court's ruling.[6]  We now vacate the district court's decision and remand the case for further proceedings.

## I.

The facts of this case have been discussed extensively both by the district court and by this court in a companion case, Valley Drug Co. v. Geneva Pharmaceuticals, Inc., No. 02-12091 (11th Cir. Sept. 15, 2003).[7]  For the sake of

---

[4] The class originally certified by the district court in its September 20, 2001 Order Granting Plaintiffs' Consolidated Motion for Class Certification encompassed "all purchasers of both brand name and generic drugs who also purchased terazosin hydrochloride directly from Abbot at any time during the period commencing March 31, 1998, through the time when the illegal agreements terminated." In re Terazosin Hydrochloride, 203 F.R.D. at 560-61.  The district court subsequently amended this order, and redefined the class as "all entities who purchased Hytrin, also known by the chemical name terazosin hydrochloride, directly from Abbot at any time during the period commencing March 31, 1998, through August 13, 1999." See id. at 561.

[5] Rule 23(f) provides:

A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order.  An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders. Fed. R. Civ. P. 23(f).

[6] Geneva did not originally join the Rule 23(f) application brought by Abbot and Zenith because it had reached a potential settlement with plaintiffs.  That settlement fell through, however, and Geneva subsequently moved to join in this appeal.  Zenith later reached a tentative settlement of its own with the plaintiffs and consequently withdrew from the appeal before the parties submitted their briefs to this court.

[7] Valley Drug reversed a separate ruling by the district court that condemned the two settlement agreements entered into by Abbot and Zenith and Abbot and Geneva as per se violations of Section 1 of the Sherman Act.  No. 02-12901, slip op. at 3858.

4

efficiency, this opinion will discuss those facts that are most pertinent to the class certification question before us.

In 1987, Abbot began exclusively marketing the chemical compound, terazosin hydrochloride, under the trademark name "Hytrin." Hytrin, which is used in the treatment of hypertension and benign prostatic hyperplasia, proved to be a profitable drug for the company. According to the Federal Trade Commission ("FTC"), Hytrin generated $540 million in sales for Abbot in 1998 alone. This figure constituted more than twenty percent of Abbot's net sales of pharmaceutical products in the United States that year. In re Terazosin Hydrochloride Antitrust Litigation, 164 F.Supp.2d 1340, 1343 (S.D. Fla. 2000) (hereinafter "In re Terazosin Hydrochloride I"), rev'd Valley Drug v. Geneva Pharmaceuticals, Inc., No. 02-12091 (11th Cir. Sept. 15, 2003).

The commercial success of Hytrin predictably whetted the appetites of generic drug manufacturers who are in the business of developing products that have similar chemical properties to successful pharmaceutical drugs but cost less than the original, and hence are usually more attractive to consumers (or at least their health maintenance organizations). In 1990, one generic drug maker, Geneva, began to take steps to create a terazosin hydrochloride drug that would contain the same active ingredients but different inactive ingredients from those

5

used in Hytrin. Like Hytrin, the generic drug developed by Geneva would be sold and marketed in tablet and capsule form.

Although in some contexts imitation may be the sincerest form of flattery, in the pharmaceutical industry imitation is almost invariably the subject of robust litigation because imitation, in the form of generic drug competition, often severely threatens to dissipate the profits a company gains from sales of the original, patented drug. The scenario between Abbot and Geneva conformed to this pattern: shortly after Abbot received notice of Geneva's intended challenge to its patents, the company exercised its statutory right to sue Geneva for patent infringement by initiating several actions against Geneva in the United States District Court for the Northern District of Illinois.[8] The ensuing litigation between the parties delayed Geneva's efforts to market its own generic drug for an

---

[8] The relevant statute here is the Drug Price Competition & Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355). This act, which modifies the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-91 ("FDCA"), is generally referred to as the "Hatch-Waxman Amendments." As noted by this court in Valley Drug, the Hatch-Waxman Amendments set forth the legal rules established by Congress to promote competition between companies that pioneer the development of a new drug and companies that develop generic substitutes. No. 02-12091, slip op. at 3859. Pursuant to the amendments, a company that includes in its application a "paragraph IV certification" (which certifies that the relevant patents challenged by the applicant are invalid or will not be infringed) must notify the original patent holder of its challenge. Id. Once notification is received, the statute provides the owner of the challenged patent with the right to bring a lawsuit against the challenging party within a certain time period (45 days) in order to delay FDA approval of the generic drug manufacturer's application. Id. at 3859-60.

6

indefinite period of time pending resolution of the parties' ongoing patent disputes.

In June 1994, Zenith also emerged as a contender in the race to bring the first generic terazosin hydrochloride drug to market when it filed an Abbreviated New Drug Application ("ANDA") for a terazosin hydrochloride drug that challenged one of Abbot's Hytrin patents.[9] After Abbot learned of Zenith's challenge, it promptly brought two suits against Zenith for patent infringement. Thus, from 1994 onwards, Abbot found itself involved in concurrent disputes with both Geneva and Zenith over the validity of its Hytrin patents while Geneva and Zenith competed with each other to bring the first generic terazosin hydrochloride drug to market.[10]

---

[9] Pursuant to the Hatch-Waxman Amendments, applications for FDA approval of a new drug can be filed in one of two ways: as a new drug application ("NDA") under § 355(b) or as an ANDA certification under § 355(j). An ANDA applicant is entitled to rely on the safety and efficacy studies filed with the application of a drug already listed and recorded by the FDA in the so-called "orange book." Id.

[10] The Hatch-Waxman Amendments create a strong incentive for a generic competitor to be the first to file an ANDA and receive FDA approval: a 180-day period of marketing exclusivity vis-à-vis other generic competitors. In other words, the first filer to receive FDA approval is entitled to market the generic versions of the drug for 180 days without competition from any other generic drug manufacturers. This period of exclusivity does not begin, however, until any related patent litigation is resolved. Prior to 1998, the FDA's "successful defense" regulation provided an additional twist on winning the 180-day exclusivity prize: if a second or subsequent generic drug manufacturer files an ANDA and successfully defends itself against a patent infringement challenge by the branded-drug manufacturer before the first filer, the 180-day exclusive marketing period is no longer an option for the first filer. The second filer can then enter the market first, but is not entitled to the period of exclusivity the first filer would have received had it prevailed first in its own challenge of the branded-drug manufacturer's patents.

7

As mentioned before, the somewhat complex history of Abbot's legal disputes with Geneva and Zenith concerning the validity of Abbot's Hytrin patents has been thoroughly covered by this circuit in <u>Valley Drug</u> and by the district court in <u>In re Terazosin Hydrochloride Litigation I</u>.  For present purposes, suffice it is to say that in late March and early April 1998, Abbot ultimately entered into separate, confidential, settlement agreements with both Zenith (March 31) and Geneva (April 1) to resolve its ongoing patent litigation disputes with the two generic drug manufacturers.  These agreements terminated on August 13, 1999, apparently in response to a FTC investigation of the agreements, which resulted in a consent settlement.  <u>See</u> <u>Matter of Abbot Labs.</u>, No. C-3945 (F.T.C. May 22, 2000), <u>also</u> <u>available</u> <u>at</u> http://www.ftc.gov/os/2000/05/c3945.do.htm.

Plaintiffs are regional wholesalers who purchased Hytrin directly from Abbot during the period the defendants' agreements were in effect.  They characterize the defendants' settlement agreements as "illegal" market-allocation arrangements that harmed direct purchasers of Hytrin by causing them to be overcharged by (1) keeping interchangeable, but less expensive, generic versions

The successful defense requirement was eventually held to be an unreasonable interpretation of the Hatch-Waxman Act by two courts of appeal.  <u>See</u> <u>Mova Pharm. Corp. v. Shalala</u>, 140 F.3d 1060, 1069-70 (D.C.Cir.1998); <u>Granutec, Inc. v. Shalala</u>, Nos. 97-1873 & 97-1874 (4th Cir. April 3, 1998) (unpublished, table decision reported at 139 F.3d 889).  After being enjoined from enforcing the regulation by the <u>Mova</u> court, the FDA dropped the requirement effective November 10, 1998.  <u>See</u> <u>Valley Drug</u>, No.02-12091, slip op. at 3862, n.12.

of Hytrin off the market; and (2) causing direct purchasers to lose discounts on Hytrin that they might have received if the settlement agreements had not shielded Abbot from generic competition. The district court agreed with the plaintiffs and granted them partial summary judgment on the issue of whether the defendants' settlement agreements constituted per se violations of § 1 of the Sherman Act. In re Terazosin Hydrochloride I.[11]

On November 30, 1999, the plaintiffs moved for class certification on behalf of all persons who directly purchased terazosin hydrochloride from Abbot during the period March 31, 1998 through the time when the settlement agreements terminated. The district court granted plaintiffs' consolidated motions for class certification on September 20, 2001, and *sua sponte* amended the order on September 28, to define the class as "all entities who purchased Hytrin, also known by the chemical name terazosin hydrochloride, directly from Abbot at any time during the period commencing March 31, 1998, through August 13, 1999." In re Terazosin Hydrochloride Antitrust Litig., 203 F.R.D. 551 (S.D. Fla. 2001) (hereinafter "In re Terazosin Hydrochloride II").

On appeal, the defendants raise a number of issues which can be condensed into two questions: (1) whether the district court erred in accepting an

---

[11]As noted previously at infra, n.7, we reversed this decision of the district court in Valley Drug, No. 02-12901, slip op. at 3858.

"overcharge" methodology for measuring impact and damages where generic drugs and branded drugs allegedly constitute separate, economically differentiated products, and (2) whether the district court erred by foreclosing discovery on the question of whether some class members benefitted from the conduct alleged to have harmed the class members on the whole. We find that because the district court improperly certified the class, this case must be remanded to permit the parties to conduct further discovery on the important issue of whether some class members have separate, antagonistic interests from the named representatives. As this issue decides the case, we do not need to reach the other arguments presented to this court by the defendants.

## II.

The burden of proof to establish the propriety of class certification rests with the advocate of the class. Jones v. Diamond, 519 F.2d 1090, 1099 (5th Cir. 1975)[12]; Heaven v. Trust Co. Bank, 118 F.3d 735, 737 (11th Cir. 1997). We review the district court's grant of class certification for an abuse of discretion. Rutstein v. Avis Rent-A-Car Systems, Inc., 211 F.3d 1228, 1233 (11th Cir. 2000)

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

10

("Assuming that the district court correctly interpreted the applicable law, we review the court's grant of class certification for an abuse of discretion.").

## III.

Rule 23 establishes the legal roadmap courts must follow when determining whether class certification is appropriate.[13]  Pursuant to Rule 23(a), a class may be

[13] In their entirety, Federal Rules of Civil Procedure 23(a) and (b) state:

(a) Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or

11

certified only if (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly.  Fed. R. Civ. P. 23(a).

These four prerequisites of Rule 23(a) are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." Prado-Steiman v. Bush, 221 F.3d 1266, 1278 (11th Cir. 2000).  Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification. See generally, Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615-18, 117 S. Ct. 2231, 2246-48, 138 L. Ed. 2d 689 (1997).

The district court ruled that class certification was appropriate in this case because it found that the plaintiffs' claims satisfied the prerequisites of Rule 23(a) and the "predominance" requirement of Rule 23(b)(3).  In re Terazosin Hydrochloride II, 203 F.R.D. at 555.  In determining that the four factors

---

against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.  Fed.R.Civ.P.23(a) and (b).

12

identified under Rule 23(a) had been met by the plaintiffs, the district court stated

that, "[t]he defendants have not seriously contested these issues." Id. Assuming

this were true (and the record of the case calls into question the district court's

assertion), a court nevertheless has the responsibility of conducting its own inquiry

as to whether the requirements of Rule 23 have been satisfied in a particular case.

Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1216 n. 37 (11th Cir.

2003) ("Under Rule 23(c)(1) '[t]he trial court has an independent obligation to

decide whether an action was properly brought as a class action, even where[, as

here,] neither party moves for a ruling on class certification.'") (quoting McGowan

v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir. 1981)).[14] In this

instance, the district court was required to evaluate whether the "adequacy of

representation" requirement could be satisfied by the named representatives

despite the fact that the most significant members of the certified class arguably

experienced a net gain from the conduct alleged to be illegal by the named

---

[14] Rule 23(c)(1) provides:

As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits. Fed. R.Civ. P. 23(c)(1).

13

representatives.[15]  Because the district court failed even to address this point when it granted class certification, it abused its discretion.[16]

Rule 23(a)(4) requires that the representative party in a class action "must adequately protect the interests of those he purports to represent." Phillips v. Klassen, 502 F.2d 362, 365 (D.C. Cir. 1974).  This "adequacy of representation" analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." In re Healthsouth Corp. Securities Litigation, 213 F.R.D. 447, 460-461 (N.D. Ala. 2003).  If substantial conflicts of interest are determined to exist among a class, class certification is

---

[15] Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied. See, e.g., Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982).

[16] In its brief discussion of whether the proposed class satisfied the "adequacy of representation" inquiry, the district court stated, "[t]he defendants have not reported any actual or apparent conflicts of interest between Louisiana Wholesale or Valley Drug and the proposed class." In re Terazosin Hydrochloride II, 203 F.R.D. at 555.  This statement cannot be reconciled with the record of this case which indicates that one of Abbot's primary arguments throughout the course of the litigation is that some of the class members actually benefitted from the allegedly illegal settlement agreements because they profited more from selling branded Hytrin in the absence of generic competition than they would have from selling Hytrin in combination with generic terazosin hydrochloride drugs at lower prices.  That Abbot may not have couched its arguments to the district court in terms directly applicable to Rule 23(a) does not mean that it failed to report any actual or apparent conflicts because the substance of Abbot's position is that a conflict existed among the class members.  At any rate, the burden to prove whether class certification is appropriate rests on the plaintiffs: thus Abbot can hardly be deemed to have "waived" its Rule 23(a) challenge as plaintiffs contend.

inappropriate.   See 7A Charles Alan Wright & Arthur R. Miller, Federal Practice & Proc. § 1768, at 326 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.").

Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a "fundamental" one going to the specific issues in controversy.   Id. at 326-27; 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.26 at 3-143 to 144 (3d ed. 1992).   A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class.   In such a situation, the named representatives cannot "vigorously prosecute the interests of the class through qualified counsel" because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.   See, e.g., In re Healthsouth, 213 F.R.D. at 461-63; See also, Auto Ventures, Inc. v. Moran, 1998-1 Trade Cas. (CCH) ¶ 71, 779, (S.D. Fla. 1997) (refusing to certify a class of Toyota dealers because "the class collapses into distinct groups of winners and losers."); Accord, Warren v. City of Tampa, 693 F.Supp. 1051, 1061 (M.D.Fla. 1988) ("Conflicts pertaining to the specific issues being litigated will bar class certification.").

For this reason, in <u>Pickett v. Iowa Beef Processors</u>, 209 F.3d 1276 (11th Cir. 2000), we reversed a district court decision granting class certification to plaintiffs where the class definition included cattle producers who claimed to have been harmed by contracts and marketing agreements that some of the unnamed members of the class had benefitted from.[17] In that case, we acknowledged the rule that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." <u>Id.</u> at 1280.

This circuit is not alone in interpreting Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members. In <u>Bieneman v. City of Chicago</u>, 864 F.2d 463 (7th Cir. 1988), the Seventh Circuit similarly denied certification of a class where the named representative purported to bring an action on behalf of all landowners in the vicinity of an airport against the City of Chicago. The plaintiff's claim alleged that the City had harmed the class members by locating an airport in close

---

[17] In <u>Pickett</u>, cattle producers acting on behalf of themselves and others similarly situated brought claims against Iowa Beef Processors, Inc. ("IBP"), under the Packers and Stockyards Act, 7 U.S.C. § 192, alleging that "forward contracts" or "marketing agreements" employed by the defendant constituted illegal, unfair business practices. 209 F.3d. at 1278. Because the class certified consisted of "all cattle producers who had sold fed cattle directly to IBP," it included producers who had benefitted from the forward contracts as well as those who claimed harm. <u>Id.</u> at 1277, 1280.

16

proximity to their property because the presence of the airport diminished the value of the class members' property. The Seventh Circuit, noting that "[s]ome of these [class members] undoubtedly derive great benefit" from the proximity of the airport to their property, ruled that class certification would be inappropriate under such circumstances and affirmed a lower court's denial of the plaintiff's motion for class certification. Id. at 465. To our knowledge, no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class. See, e.g., Morris v. McCaddin, 553 F.2d 866, 870-71 (4th Cir. 1977) (affirming district court's denial of class certification where "the interests of the named plaintiffs would have been antagonistic to the interests of many of the unnamed members of the class"); Phillips, 502 F.2d at 366-67 (refusing class certification where some class members were pleased by the defendants' actions which were challenged by the named representatives).

When viewed in the light cast by the aforementioned cases, the district court's decision to certify a class of Hytrin purchasers notwithstanding the existence of a potential, significant conflict among class members cannot be countenanced. Here, the plaintiffs have not met their burden under Rule 23(a)(4) of demonstrating that no fundamental conflict exists within the class. In

particular, they have not offered any facts to challenge the defendants' assertions that the three national wholesalers, whose transactions with Abbot constitute over fifty percent of the plaintiffs' total claims, experienced a net gain from the absence of generic drugs in the market for terazosin hydrochloride.[18] By contrast to plaintiffs' silence on this pivotal issue, the defendants strenuously argue that a number of the parties included in the class certified by the district court, particularly the three national wholesalers, sell their products on a "cost-plus" basis pursuant to which they charge the same percentage mark-up from their acquisition cost on both branded and generic drugs.[19] Given the existence of these contracts and other factors relevant to the industry, some of these national

---

[18] As of 1996, there were six national wholesalers: McKesson HBOC ("McKesson"), AmeriSource, Bergen-Brunswig, Cardinal, Foxmeyer, and Bindley Western Industries ("BWI"). Foxmeyer subsequently filed for bankruptcy in August 1996 and McKesson acquired its assets. See In re Brand Name Prescription Drugs Antitrust Litigation, No. 94 C 897, MDL 997 (N.D.Ill.Aug. 6, 1998). AmeriSource and Bergen-Brunswig later merged, as have Cardinal and BWI, resulting in only three national wholesalers existing today, all of whom are included in the class certified by the district court.

[19] Because both parties have raised the issue in their brief, it is worth noting that a distinction can and should be drawn between the cost-plus contracts employed in this industry and the cost-plus exception discussed by the Supreme Court in Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968), and in Kansas v. UtiliCorp United Inc., 497 U.S. 199, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990). Although the defendants have noted that industry buyers negotiate contracts on a "cost-plus" basis, the fact that the buyers employ this terminology does not in and of itself establish that the pharmaceutical industry would be covered by the cost-plus exception from the Hanover Shoe rule. Accord UtiliCorp, 497 U.S. at 216, 110 S.Ct. at 2817 ("The rationales underlying Hanover Shoe and Illinois Brick will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.'") (quoting Illinois Brick Co. v. Illinois, 431 U.S. 720, 744, 97 S. Ct. 2061, 2071, 52 L. Ed. 2d 707 (1977) (alteration in original).

wholesalers arguably make more money on the sale of the branded product than on the generic product because the wholesalers charge more for, and collect more from, branded products than generic drugs.

While the defendants lay great emphasis on the existence of "cost-plus contracts," this fact, standing on its own, would be insufficient to prove net economic benefit if it were not for the specific nature of the product and the industry involved in this case. In addition to noting that the national wholesalers charge more, and receive more, from selling higher-priced branded Hytrin, the defendants claim—and we do not disagree or agree at this point—that because of the inelastic demand for certain pharmaceutical products, "a drop in price of terazosin (due to generic competition or otherwise) does not lead to an increase in sales volumes on which a wholesaler could make up its lower margin." (Def. Brief on Appeal of Class Certification. No. 02-10171-J at 10). The reason for this according to Abbot is that "[s]o-called 'maintenance drugs' that are taken continuously to treat a severe chronic condition—like terazosin—are one of the very rare categories of products whose sales are not responsive to price fluctuations. Indeed, the total demand for terazosin actually decreased after generic entry." Id.

Along with this fact, the record indicates that some of the national wholesalers are further injured rather than benefitted by generic competition because the wholesalers, who play a central role in the distribution of branded drugs, are often bypassed in the distribution chain for many generic sales, causing them to lose sales. For example, retail pharmacies like Rite-Aid, one of McKesson's largest customers, purchased most of their branded Hytrin from wholesalers while purchasing the bulk of their generic terazosin drugs directly from Geneva, a generic drug manufacturer. From the record provided to us thus far, it seems likely that the national wholesalers lose both margin and volume with generic competition. Thus, these class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when branded drugs dominate the market. Class certification under these circumstances would be inappropriate. See Phillips, 502 F.2d at 367 ("When as here, there is complaint as to injury from an allegedly invalid action. . . and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined.").

It is important to stress that as an appellate court reviewing this record, we do not here pass judgment on the ultimate legitimacy of Abbot's arguments. It

may turn out that the national wholesalers presently encompassed by the class do not experience a net benefit from the absence of generic competition because of factors not disclosed in the record before us thus far or because, after a careful assessment of the facts, the evidence provided by the defendants is deemed to be inaccurate or unreliable. If for either of these reasons it is determined that no fundamental conflict actually exists, the plaintiffs may yet meet their burden of proof necessary to maintain a class action under Rule 23(a)(4). At this stage, however, the record needed to decide this issue remains incomplete because the district court improperly denied Abbot's request to conduct so-called "downstream discovery," i.e., discovery regarding the wholesalers' sales practices. To understand why the district court made its decision requires an understanding of antitrust law in general and antitrust standing in particular.

The plaintiffs contend, and the district court agreed, that "downstream discovery" should be foreclosed by the Supreme Court's holdings in Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968), and Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L.Ed. 2d 707 (1977). While we agree that the holdings in these two cases are relevant to some of the issues which will need to be addressed in this case by the trial court, neither Hanover Shoe nor Illinois Brick addressed a party's burden to

21

satisfy the class certification prerequisites established by Rule 23(a). Instead, those cases concerned the unique circumstances under which a plaintiff in an antitrust action is granted standing to sue defendants notwithstanding the fact that the plaintiff arguably has not suffered a net economic loss from the defendants' wrongful conduct because it was able to pass on the illegal overcharges it incurred to its own consumers.

As we have acknowledged, "Hanover Shoe said that a manufacturer cannot assert a 'passing on' defense (that is, the defense that the plaintiff has no damages when he passed the overcharge on down the production line) against a direct purchaser of its product." Lowell v. American Cyanamid Co., 177 F.3d 1228, 1229 n. 3 (11th Cir. 1999). We do not deviate from this understanding nor do we disagree with the Tenth Circuit's declaration, cited to us by Louisiana Wholesale and Valley Drug in their brief, that "Hanover Shoe precludes the argument that [plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by defendants' anticompetitive behavior. . . . As a direct purchaser, [plaintiff] may sue for and recover the full amount of the illegal overcharge." Sports Racing Services v. Sports Car Club of America, 131 F.3d 874, 885 (10th Cir. 1997) (quotations omitted). These cases simply stand for the proposition that a direct

purchaser who passes on overcharges to his own customers nevertheless suffers cognizable antitrust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct. Noticeably, however, the question these cases address is a distinctly separate question from the issue of whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of a class.

Nevertheless, plaintiffs' brief is replete with references to Hanover Shoe and Illinois Brick as if these cases were a talisman warding away the requirements of Rule 23 and barring this court from exercising its duty to conduct an inquiry into whether the plaintiffs' proposed class satisfies the four requirements of Rule 23(a). We do not interpret the holdings of Hanover Shoe and Illinois Brick in this broad fashion. Similarly, we disagree with Louisiana Wholesale and Valley Drug when they assert "it would be a complete perversion of the rule and rationale of these cases to stop indirect purchasers from being able to recover these overcharges." (Pls. Brief on Appeal of Class Certification, No. 02-10171-J at 59). This argument misses the mark by our reasoning because our holding today in no way inhibits those direct purchasers who potentially experienced a net benefit from the defendants' conduct from nevertheless bringing suit against the defendants to recover their damages in the form of an overcharge.

23

We do not dispute that if the defendants' settlement agreements illegally restrained competition, then all of the class members, including the three national wholesalers, would have suffered antitrust injury that is cognizable under <u>Hanover Shoe</u>. In such a scenario, the wholesalers would be afforded the right to sue the defendants for their alleged antitrust violations, even if they experienced a net gain, provided they choose to exercise their right to do so (and provided the <u>Hanover Shoe</u> "cost-plus exception" does not apply to them). Yet while we do not challenge this part of the plaintiffs' arguments, we do note that neither <u>Hanover Shoe</u> nor its progeny imbue the named representatives in this case with the automatic right to certify a class where the economic reality of the situation reveals that a fundamental conflict may exist among the class members because of their different economic circumstances and different economic interests. Instead, we read <u>Hanover Shoe</u> as directing a court to overlook the potential net gain, or conversely the potential absence of a net loss, that a direct purchaser may in fact have experienced for the purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation. <u>Hanover Shoe</u> does not hold that this net economic gain must be ignored or overlooked by a court when determining whether Rule 23 has been satisfied. Accordingly, in the absence of direction from the Supreme Court on this issue, we

24

will not interpret the "fundamental conflict/ antagonistic interests" prong of the Rule 23(a)(4) inquiry in this case any differently than we would apply it in all other contexts. See, e.g., Pickett, 209 F.3d at 1280 (ruling that a class cannot be certified where some class members benefitted economically from conduct alleged to be illegal by the named representatives).

In the present case, the defendants have presented evidence that the cognizable antitrust injury suffered by the national wholesalers may have been outweighed by the economic benefits these parties experienced in the absence of generic competition. In short, the profits received by some class members from selling branded Hytrin in the absence of generic competition, and the greater volume of Hytrin sold by these parties in the absence of generic competition, may suggest a tradeoff the national wholesalers were content to make in order to experience greater profits. This economic reality would lead the national wholesalers and other similarly situated class members to have divergent interests and objectives from the named representatives with respect to the fundamental issues in controversy in this litigation. Along these lines, we note that this case has been brought by two regional wholesalers with relatively small claims who do not sell on a cost-plus basis, while the three national wholesalers with the bulk of the claims have chosen not to participate in the litigation or have assigned their

interests to third-parties. This, along with the other evidence provided in the record, suggests that the interests of the named representatives are not substantially aligned with the interests of all of the class members whom they purport to represent because some of the class members would have experienced a net gain from the conduct alleged to be wrongful in this instance. It is highly likely under such circumstances that the economic interests of these putative class members would be substantially in conflict with the interests of the named representatives who did not experience a net gain from the defendants' conduct. See, e.g., In re Healthsouth, 213 F.R.D. at 461-62, quoting Telecomm Technical Services, Inc. v. Siemens Rolm Communications, Inc., 172 F.R.D. 532, 544 (N.D. Ga. 1997) ("[A]ntagonistic interests are not only those which directly oppose one another, but also are those which may be hostile to one another or unharmonious such that one party's interest may be sacrificed for another's.").

Bearing in the mind that for purposes of analyzing whether any antagonistic interests exist between the proposed representatives and the rest of the class, "the defendant does not have to show actual antagonistic interest; the potentiality is enough," In re Healthsouth, 213 F.R.D. at 462, we deem that class certification is inappropriate in this case given the record before us. Nevertheless, as mentioned above, the national wholesalers and those similarly situated are free to initiate their

26

own antitrust claims against the defendants pursuant to the <u>Hanover Shoe</u> rule.[20]

Accordingly, we have no reason to believe that our opinion today will dull the enforcement and deterrence functions that <u>Hanover Shoe</u> and <u>Illinois Brick</u> are meant to promote.

As another circuit noted in <u>Paper Systems, Inc. v. Nippon Paper Industries Co., Ltd.</u>, 281 F.3d 629, 633 (7th Cir. 2002), the <u>Hanover Shoe</u>/<u>Illinois Brick</u> rules "create powerful incentives [for direct purchasers] to investigate and file suit," and "to maximize deterrence" by ensuring that the direct purchasers will be able to recover the "full overcharge." Neither of these important policy goals is thwarted by a refusal to include within a class definition sophisticated class members whose actual economic interests significantly diverge from the named representatives. Those direct purchasers of Hytrin who did not experience a net benefit from the defendants' allegedly illegal conduct are certainly free to pursue a class action on behalf of all similarly situated parties against the defendants provided they satisfy the other requirements of Rule 23(a) and (b). Similarly, those members who may

---

[20] We note that the three national drug wholesalers—McKesson, Cardinal, and Bergen-Brunswig—are sophisticated businesses that are more than capable of bringing a suit on their own behalf: each of these companies has been ranked in the top 100 of the recent Fortune 500 list. Given the high level of sophistication of the national drug wholesalers, these entities do not suffer a hardship from not being included in the proposed class because they are very able to proceed with individual claims if they feel they have been harmed. <u>Accord</u>, <u>Ansari v. New York University</u>, 179 F.R.D. 112, 115 (S.D.N.Y. 1998) (adequate financial resources of class members considered as a factor that weighs against the need for class certification).

have experienced a net benefit from the defendants' conduct are nevertheless free to assert their own claims against the defendants under <u>Hanover Shoe</u> because the 'passing on' defense will not apply against them unless the defendants establish that they are entitled to an exception to this rule.[21] Thus, there is no reason to believe, as the plaintiffs lament, that denying class certification in this case will enable the defendants to reap the fruit of their allegedly illegal conduct.

In short, all we hold today is that the claims of these disparate groups cannot be mixed together under Rule 23(a) where the economic reality of the situation leads some class members to have economic interests that are significantly different from - - and potentially antagonistic to- -  the named representatives purporting to represent them.[22] We also note that this holding, which requires the

---

[21] Because the issue is not expressly before the court, we do not rule on the question of whether those class members who potentially experienced a net gain from defendant's conduct can form a class of their own to challenge the defendants for their alleged antitrust violations. Although we do not reach this issue, we believe the holdings of the Supreme Court in <u>Hanover Shoe</u> and <u>Illinois Brick</u> make this the likely conclusion provided the other prongs of Rule 23(a) are satisfied and at least one of the three alternative requirements under Rule 23(b) are met.

[22] Even if we assume *ex arguendo* that all of the plaintiff class members share one common interest, e.g., vindicating the nation's antitrust laws, this common interest alone would not be sufficient to satisfy Rule 23(a)(4) because a fundamental conflict still exists where the actual economic interests and objectives of the class members diverge because some members experienced a net benefit from the defendant's conduct while others are harmed. <u>See Pickett</u>, 209 F.3d at 1280; <u>See</u> <u>Phillips,</u> 502 F.2d at 366-67; <u>Cf.,</u>  <u>Hansberry v. Lee</u>, 311 U.S. 32, 44-45, 61 S. Ct. 115, 119-20, 85 L. Ed. 22  (1940) ("It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation.  It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class, so that any group, merely because it is of the class so constituted, may be

28

district court to permit "downstream discovery" to determine whether a fundamental conflict exists among the class members, does not conflict with the Supreme Court's concern that the ability of a party to assert a "passing-on" defense might undermine a plaintiff's ability to recovery damages by unduly complicating the issue of proof of damages. Plaintiffs, citing Hanover Shoe, which mentions that allowing a "passing on" defense would vastly complicate antitrust litigation by injecting "massive evidence and complicated theories," suggest that conducting "downstream discovery" here would require a complex netting process that the Court sought to avoid. Hanover Shoe, 392 U.S. at 493, 88 S. Ct. at 2231. We disagree.

First, the district court retains discretion in determining how much discovery is enough to establish whether or not the class members experienced a net benefit or net loss in the absence of generic competition. Second, and perhaps more importantly, this argument from counsel for Louisiana Wholesale and Valley Drug is baffling since it is the plaintiffs who initially informed the district court that an algebraic formula easily could be devised to compute the plaintiffs' claimed damages. Many of the factors taken into account by plaintiffs' experts in

deemed adequately to represent any others of the class. . . . Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to present, does not afford that protection to absent parties which due process requires.").

29

deriving their formula, e.g., "the amount of Hytrin purchased from Abbot by a class member," "the expected price difference between Hytrin and the generic [substitute]," and "the expected substitution rate of generic terazosin [hydrochloride]" can just as easily be used in creating a formula to determine whether certain class members experienced a net gain in the absence of generic competition. In re Terazosin Hydrochloride II, 203 F.R.D. at 559 (alterations in original). Along these lines, the district court noted that the plaintiffs had access to Abbot's "sales volume, pricing, and discount records," which would enable plaintiffs to establish class-wide impact and damages for purposes of satisfying the "predominance" requirement of Rule 23(b)(3). Id. While we do not reach an opinion on that particular holding of the district court, we have no reason to believe that it would be inherently more difficult to ascertain similar evidence with respect to the three national wholesalers and other Hytrin purchasers to determine whether these class members experienced a net benefit from the effects of defendants' conduct. Accordingly, we do not believe that it is unduly burdensome to require the named representatives to bring forth evidence to the court that no fundamental conflict exists among the class members, especially in view of the fact that under Rule 23 it is the plaintiffs, as the moving party, who bear the burden of proving that class certification is appropriate because class actions are

not an automatic entitlement under our rules of civil procedure. Accord, Lim v. Citizens Savings & Loan Ass'n., 430 F.Supp. 802, 807 (N.D.Cal. 1976) ("Although the requirements of Rule 23 of the Federal Rules of Civil Procedure are to be liberally construed . . . class actions are not automatic in Title VII suits and petitioners must meet the prerequisites of Rule 23.")

In this case, Louisiana Wholesale and Valley Drug chose not to proffer any evidence along these lines and, having failed to satisfy their burden, have not demonstrated that class certification is appropriate. Thus, where the record presently reveals that the antitrust injury suffered by some class members was arguably outweighed by the benefits they gained from the absence of generic competition, the actual economic interests of these members would substantially diverge from the objectives of the named representatives and other members. Rule 23(a)(4) does not permit a class to be certified under such circumstances because it would be impossible for the named representatives to "vigorously prosecute the interests of the class" if significant members in the class actually experience a net benefit from the conduct challenged by the named representatives. In re Healthsouth, 213 F.R.D. at 456; see also, Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) (noting that "adequacy of representation means that the class representative has common interests with unnamed class members and

31

will vigorously prosecute the interests of the class through qualified counsel.") (internal quotations omitted). In the matter at hand, it would not be difficult to imagine that the national wholesalers, who benefitted from the defendants' conduct, would have substantially different interests and objectives than the named representatives purporting to represent them. Cf., Sosna v. Iowa, 419 U.S. 393, 403, n.13, 95 S. Ct. 553, 559, 42 L. Ed. 2d 532 (1975) (noting that although "[t]here are frequently cases in which it appears the particular class a party seeks to represent does not have a sufficient homogeneity of interests to warrant certification. . . . In this case, however, it is difficult to imagine why any person in the class appellant represents would have an interest in seeing Iowa Code § 598.6 (1973) upheld.").

For the foregoing reasons, we VACATE the district court's order granting class certification and REMAND the case for proceedings consistent with this opinion.

SO ORDERED.