**In re SKELAXIN (METAXALONE) ANTITRUST LITIGATION.**

No. 1:12–md–2343.

United States District Court, E.D. Tennessee, at Chattanooga.

June 10, 2013.

*Order on Direct Purchaser Plaintiffs'*
*Motion for a Protective Order*
*[Doc. 177]*

WILLIAM B. MITCHELL CARTER,
United States Magistrate Judge.

### I. Introduction

This putative class action is an anti-trust action brought, in part, under Sections 1 and 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act against defendants, King Pharmaceuticals, Inc. (King) and Mutual Pharmaceutical Company, Inc. (Mutual) alleging they illegally delayed entry of a certain generic drug into the open market, thereby causing wholesalers of the drug to suffer damages. This matter comes before the undersigned on the motion of the Direct Purchaser Plaintiffs (DPPs) for a protective order directing defendants to withdraw twenty-five identical subpoenas, most of which have been served on absent members of the putative DPP class. [Doc. 177]. Some of the subpoenas have, however, been served on entities that are not putative members of the DPP class (hereinafter referred to as "nonmembers".) As to these nonmembers, defendants assert the DPP representatives have no standing to challenge the subpoenas. The undersigned agrees, and a protective order as to these entities will be denied.

As to the absent members of the putative DPP class (herein after referred to as "absent members"), the primary issue raised by this motion is whether the defendants are entitled to "down-stream discovery" from them. Rejecting the holding of *Valley Drug Company v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir.2003), the undersigned Magistrate Judge concludes downstream discovery is not relevant to the DPPs' damages of class certification. However, it is unclear whether downstream discovery is relevant to the Indirect Purchaser Plaintiffs' damages; therefore, I will reserve ruling on this request pending receipt of more information from the parties.

Request Nos. 6, 7, and 8 of the subpoenas seek information that is not relevant to the claims or defenses of the action, ventures into unnecessary satellite litigation, and pointedly seeks matters protected by the attorney-client privilege and the work product doctrine. A protective order will be issued for the absent DPP members as to these requests.

Finally, the undersigned concludes Request No. 1 of the subpoenas asks for relevant information. The DPPs, however, contend that defendants already have this information and that requiring the absent members to produce it would be duplicative

and overly burdensome. The undersigned will reserve ruling on this request pending receipt of more information from the parties.

## II. Background

This action centers on the alleged collaborations between King Pharmaceuticals, Inc. (King) and Mutual Pharmaceutical Company, Inc. (Mutual) to delay the entry of the generic form of a muscle relaxant called metaxalone into the open market. Metaxalone is manufactured and sold by King under the brand-name, Skelaxin. Various anti-trust actions filed across the country against King and Mutual under Sections 1 and 2 of the Sherman Antitrust Act and seeking damages under Section 4 of the Clayton Act have been consolidated into this one multidistrict litigation. Motions for class certification are pending before the Court, and the putative class has been divided into three groups: DPPs, the Indirect Purchasers for Resale (IPPs), and the End Payor Plaintiffs (End Payors). The DPPs are primarily wholesalers who allege they purchased Skelaxin directly from King during the class period. The IPPs are primarily retail pharmacies who allege they purchased Skelaxin from the wholesalers, the DPPs, during the class period. Finally, the End Payors are primarily health and welfare benefit funds, trust funds, and insurance companies who allege they purchased and/or provided reimbursement for Skelaxin or its generic equivalent.

The undersigned will briefly recount the plaintiffs' claims to the extent necessary to address the discovery issues at hand. The plaintiffs' claims in this action are set forth in detail in the District Court's memorandum addressing the defendants' motion to dismiss. (*See* Court's Memorandum, Doc. 200).

Plaintiffs allege the following: The FDA approved the sale and marketing of Skelaxin in 1962. The patent on the active ingredient of Skelaxin, metaxalone, expired in or around 1979. The then patent holder for metaxalone, pharmaceutical company Elan, took steps to delay entry into the market of generic metaxalone by various means, including filing a sham patent application concerning an allegedly new means of ingesting metaxalone. In 2001, various manufacturers began to seek approval of their generic metaxalone

products. One of those generic manufacturers was Mutual. In June 2003, King acquired the rights to Skelaxin, specifically one patent for metaxalone and another pending patent related to metaxalone. Plaintiffs allege that this second patent was invalid and that King knew it. Plaintiffs further allege that, beginning in 2004, King engaged in a pattern and practice of filing sham patent infringement suits against companies attempting to manufacture a generic metaxalone product and baseless petitions with the FDA to halt or delay the entry of same into the market. In 2005, King began negotiations with those companies, including Mutual, to settle the infringement suits by paying large sums of money to them in exchange for the companies' agreements not to manufacture a generic metaxalone product. On December 6, 2005, King and Mutual entered into just such an agreement. Mutual also agreed to aid King in its efforts to delay other companies' entries into the market of a generic metaxalone product. Plaintiffs claim King has paid Mutual in excess of $20 million for this purpose. As a result of King's pattern of filing invalid patent infringement suits against companies attempting to introduce a generic metaxalone product into the market and King's pattern of filing baseless FDA petitions concerning generic metaxalone products, a generic metaxalone product was not released into the market until April 9, 2010. Finally, plaintiffs allege defendants' unlawful conduct forced them to pay substantial overcharges to purchase Skelaxin during the relevant class period.

Between April 22, 2013 and April 25, 2013, defendants caused to be issued from various district courts throughout the United States twenty-five subpoenas duces tecum. The subpoenas each asked for the same 11 categories of documents to be produced. (*See* Doc. 179–1 for a list of the document requests and the DPPs objections to them). On May 8, 2013, the DPPs' class representatives; Professional Drug Company, Inc. ("Professional Drug"), Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer"), Rochester Drug Co–Operative, Inc. ("Rochester"), Ahold USA, Inc. ("Ahold"), and Stephen L. LaFrance Holdings, Inc. and its wholly-owned subsidiary Stephen L. LaFrance

Pharmacy, Inc. d/b/a/ SAJ Distributors (collectively "LaFrance"), moved under Fed. R.Civ.P. 26 for an order directing the Defendants King Pharmaceuticals, Inc. ("King") and Mutual Pharmaceutical Company, Inc. ("Mutual") to withdraw the twenty-five subpoenas they had served.

According to the DPP representatives, most of the subpoenas were served on absent members of the putative DPP class; however, seven of the companies subpoenaed did not purchase any Skelaxin and therefore cannot be members of the DPP class. Those companies are Magellan Medicaid Administration, Inc.; Omnicare, Inc.; Kaiser Foundation Health Plan; Medco Health Solutions; Morris & Dickson Co.; OptiSource, LLC; and UnitedHealth Group, Inc. None of the subpoenas at issue were served on the DPP class representatives. On May 10, 2013, the undersigned entered an order expediting the briefing schedule for the DPPs' motion and ordering that no response be made to the 25 subpoenas until the undersigned could rule on the DPPs' motion. (*See* Order, Doc. 182). The counsel for the DPP class and defendants have met and conferred and have been unable to resolve any of the issues raised by this motion.

### III. Discussion

### A. DPP Representatives' Standing to Challenge Subpoenas Served on Nonmembers

Defendants argue, with little elaboration or citation to authority, that, as to the nonmembers on whom they served subpoenas, "plaintiffs' motion is entirely unjustified and improper." (Defendants' Response, Page ID# 6600). The undersigned assumes defendants mean that the representatives for the DPP class have no standing to challenge subpoenas served upon entities who cannot be members of the DPP class. The undersigned agrees.

■ Federal Rule of Civil Procedure 23(a)(4) requires a court to determine prior to certifying a class action that, *inter alia,* "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4), *see also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("[T]he Due Process Clause of course requires that

the named plaintiff at all times adequately represent the interests of the absent class members.") By inference, a class representative does not have authority to represent the interests of a person who is not and cannot be a class member.

■ Further, absent some showing that the DPP class has an actual and justifiable privacy interest in the records sought from the nonmembers, the DPP representatives have no standing to seek a protective order as to the subpoenas sent to these nonmembers. *See Mann v. University of Cincinnati,* 114 F.3d 1188, 1997 WL 280188, *4 (6th Cir.1997). In *Mann,* the plaintiff sought to quash a subpoena served on a medical provider for her medical records. The court determined she did have standing to move to quash the subpoena since she claimed some personal right or privilege to the documents sought. *Id.* The same principle of standing should apply to a request for a protective order made pursuant to Fed.R.Civ.P. 26(c). *See* 8A CHARLES ALAN WRIGHT, & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2035 (3d ed. April 2013) ("A party may not ask for an order [under Rule 26(c) ] to protect the rights of another party or a witness if that party or witness does not claim protection for himself, but a party may seek an order if it believes its own interest is jeopardized by discovery sought from a third person.") (brackets added); *accord Laxalt v. McClatchy,* 809 F.2d 885, 891 (D.C.Cir.1987) ("The appellants seek access to records possessed by and pertaining to persons other than Laxalt, and he [Laxalt] has not asserted any personal privacy interest in the contents of those records. A litigant generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties.... This rule clearly applies to discovery proceedings.") (internal citations omitted, brackets added); *In re Subpoena Duces Tecum Served Upon Capito,* 2013 WL 499244 *3 (E.D.Tenn. Feb. 7, 2013) (finding movant has standing to challenge subpoena served on third party if the records sought contain movant's confidential information). In this case, the DPP representatives have not identified the particular interest that the DPPs have in the documents sought from the non-

members, and the DPP representatives do not have authority under Rule 23 to represent persons or entities which are not and cannot be members of the DPP class. Consequently, the undersigned concludes that, as to the nonmembers, the motion for a protective order must be denied.

The undersigned does note that Rule 26(c) provides that "[a] party or *any person from whom discovery is sought* may move for a protective order in the court where the action is pending...." Fed.R.Civ.P. (c)(1). If the nonmembers choose to move for a protective order before this court, they will be in a much better position to represent their interests than the DPP representatives. Further, the undersigned will be better able to address any considerations which are unique to the nonmembers, if any exist. In addition, the nonmembers may, of course, move to quash the subpoenas in the district courts from which the subpoenas were issued. *See* Fed.R.Civ.P. 45(c)(3).

Finally, the undersigned cautions that, to the extent the undersigned issues a protective order for any portion of the subpoenas served on the absent DPP members, the undersigned will do the same for the subpoenaed nonmembers if they move for a protective order *unless* the defendants can show some meritorious reason unique to the nonmembers to allow the requested discovery. *Absent such a reason,* if the defendants unreasonably persist in seeking to obtain the information requested in the subpoenas from the nonmembers and if the nonmembers file a motion for a protective order in this court as to these requests, then the court will grant the motion for a protective order and consider sanctions against defendants.

B. *Request for Protective Order as to Subpoenas Served on Absent Class Members*

1. *Standard of Review*

The DPP representatives and the defendants each assert the other bears the burden of proof to prevail on this motion. According to the DPP representatives, defendants must obtain court permission to seek discovery from absent class members, even in those cases where the class has not yet been certified. The defendants, on the other hand,

argue the representatives bear the burden to show there is good cause to issue a protective order under Rule 26(c).

■ "Discovery of unnamed members of a *proposed* class requires a demonstration of need." Manual for Complex Litigation § 21.14 (4th ed.) (emphasis added), *accord Groth v. Robert Bosch Corp.,* 2008 WL 2704709 (W.D.Mich. July 9, 2008) (unpublished) (proposed class action in which court held "[t]he court should only allow discovery of absent class members upon a showing of 'particularized need.'") On the other hand, where a party moves for a protective order under Rule 26(c), the burden is on the moving party to show good cause for the issuance of the protective order. Rule 26(c) ("the court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.") The court in *Abraham v. Trinity Health Corp.,* 2013 WL 2051160 (E.D.Mich. May 14, 2013) (unpublished) elaborated on the standard required to obtain a protective order:

> Rule 26(c) provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." Fed.R.Civ.P. 26(c). "While District Courts have the discretion to issue protective orders, that discretion is limited by the careful dictates of Fed.R.Civ.P. 26 and 'is circumscribed by a long-established legal tradition which values public access to court proceedings.'" *P & G v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir.1996). "The burden of establishing good cause for a protective order rests with the movant." *Nix v. Sword,* 11 Fed.Appx. 498, 500 (6th Cir. May 24, 2011 [2001]) (citing *General Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d 1204, 1212 (8th Cir.1973)). "To show good cause, a movant for a protective order must articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought and cannot rely on mere conclusory statements." *Id.* (citing *Avirgan v. Hull,* 118 F.R.D. 252, 254 (D.D.C.1987)).

In *Abraham,* the court issued a protective order on the grounds that the information

requested was irrelevant to the case, and its production would be unduly burdensome. *Id.*

██ Application of Rule 26(c) assumes that a party has the right to issue a discovery request in the first place. However, as discussed, in a class action, even a putative class action, the party seeking discovery from an unnamed class member must first show a particularized need for said discovery and first seek permission from the court. Since this rule is a gateway rule to discovery in class actions, it would seem to trump the burden imposed by Rule 26(c) on the moving party, and, on this basis alone, the undersigned could grant the motion for a protective order as to the unnamed members. But, out of an abundance of caution, the undersigned will address each subpoena issued to the unnamed members on two levels: (1) whether the defendants have shown a particularized need for the discovery requested and (2) whether the DPPs have shown good cause to issue a protective order as to the discovery requested.

Finally, in evaluating each discovery request at issue, the undersigned will also consider the court's obligations to limit discovery under the conditions imposed by Fed. Rule Civ. P. 26(b) (2)(C)(i) and (iii) which state:

(C) *When Required.* On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

\* \* \*

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

### 2. Absent DPP Class Members—Down-Stream Discovery—Request Nos. 2, 3, 4, 5, 9, 10, and 11

If a manufacturer's sale of a product to a wholesaler starts at the headwaters of the stream of commerce, then the wholesaler's resale of the product to an indirect purchaser is down-stream. Down-stream discovery is information from the DPPs, the wholesalers of Skelaxin and generic metaxalone, concerning the DPPs' own sales and prices of Skelaxin and the generic metaxalone to the IPPs. Down-stream discovery also includes information relating to the DPPs' profits for Skelaxin and generic metaxalone. Defendants assert they need down-stream discovery because it is relevant to the DPPs' damages, to the IPPs' damages, and to the question of whether the DPPs should be certified under Fed.R.Civ.P. 23 as a class.

Each of the twenty-five subpoenas at issue in this motion asks for the same eleven categories of information. Request Nos. 2, 3, 4, 5, 9, 10, and 11 seek down-stream discovery from absent members of the DPP class. (*See* Doc. 179–1, Exhibit A to DPPs' Memorandum In Support Of Motion For Protective Order). Request No. 2 asks for "information regarding your sales of Skelaxin and generic metaxalone between January 1, 2005, and the present . . . ." (Page ID # 5367). Request No. 3 asks for "your profits or losses on a monthly basis from distributing or reimbursing Skelaxin and generic metaxalone . . ." (Page ID # 5368). Request 4 asks for contracts "that relate to the pricing of Skelaxin or generic metaxalone . . ." or "that relate to the profits you made on Skelaxin or generic metaxalone . . ." (Page ID # 5369). Request No. 5 asks for "all documents relating to your practice of or experience with generic bypass, including documents relating to generic bypass of Skelaxin, generic metaxalone, other muscle relaxants, or drugs subject to similar levels of generic bypass." (Page ID # 5370). Request No. 9 seeks all documents "describing any practice, custom, or policy of selling pharmaceuticals such as Skelaxin on a cost-plus basis." (Page ID # 5372). Request No. 10 seeks "[a]ll documents relating to the analysis of the profitability or reimbursing for brand-name pharmaceutical

products as compared to generic versions of the same drugs...." (Page ID # 5373). Request No. 11 asks for more information concerning the profitability of Skelaxin and the generic metaxalone, "including documents that discuss the comparative profitability of any other branded and generic drugs."

### a. Downstream Discovery—Information About Drugs Other Than Metaxalone

Request Nos. 5, 9, 10, and 11 are global requests asking for information that not only relates to Skelaxin and generic metaxalone but also to all of the pharmaceuticals sold by the entity subpoenaed. The DPPs assert that these requests are overly broad and that the information is not relevant. Defendants have not even attempted to explain the relevance of other drugs to the claims or defenses in this case. Consequently, to the extent that any of these requests ask for information relating to drugs other than Skelaxin and/or generic metaxalone, the undersigned concludes they are irrelevant to the claims or defenses of this case. In the alternative, to the extent there may be some limited relevancy of the requested information about drugs other than metaxalone, their usefulness to this case is outweighed by the burdensomeness of providing this huge range of documents.

### b. Down–Stream Discovery—Relevancy to DPPs' Damages

The law establishing the measure of damages for the DPPs, should they prevail in their anti-trust action against defendants, is long settled: the measure of their damages will be the difference between the price paid for Skelaxin and the price they would have paid for generic metaxalone (the overcharge) had defendants not delayed generic metaxalone's entry into the market. *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

In *Hanover Shoe* and *Illinois Brick*, the Supreme Court held that (1) a direct purchaser's payment of an overcharge constitutes injury under Section 4 of the Clayton Act equal to the "full amount" of the overcharge, regardless of the effects of the overcharge on the purchaser's own profits, and

an antitrust defendant may not assert a "pass on" defense; and (2) *only* a direct purchaser, and not others in the chain of distribution, has antitrust standing under federal law to recover such overcharges. *Id.* The Supreme Court explained that tracing the effects of an overcharge down the chain of distribution, *i.e.* passing on the overcharge from the direct purchaser to the indirect purchaser, can be enormously complicated, involving "massive evidence and complicated theories" which, if permitted, would undermine the effectiveness of private antitrust suits. *Hanover Shoe*, 392 U.S. at 493–94, 88 S.Ct. 2224. As the *Hanover Shoe* Court explained,

> ... if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to their customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them.

*Id.* at 494, 88 S.Ct. 2224.

In *Illinois Brick*, the Supreme Court held that if a manufacturer in an anti-trust action could not use the "pass-on" defense against a direct purchaser's claim for overcharges, then an indirect purchaser could not bring a claim against a manufacturer for overcharges passed on to it from the direct purchaser. 431 U.S. at 745–46, 97 S.Ct. 2061. The *Illinois Brick* Court declined to consider an exception to the *Hanover Shoe* rule even for contractors (direct purchasers) who "purport to charge a fixed percentage above their costs." *Id.* at 744, 97 S.Ct. 2061. To do so would erode the policy behind *Hanover Shoe*, which is to encourage vigorous private enforcement of anti-trust laws. *Id.* at 745–46, 97 S.Ct. 2061. *Illinois Brick* unequivocally affirmed the *Hanover Shoe* rule that the measure of damages for a direct purchaser in anti-trust litigation is "the full extent of the overcharge paid by them" to the manufacturer. *Id.* at 746, 97 S.Ct. 2061.

■ In light of *Hanover Shoe* and *Illinois Brick*, the undersigned concludes that down-stream discovery is not in any way relevant to the DPP's measure of damages, should they prevail in this action. Defendants have cited no cases to the contrary on this issue. To the extent that defendants rely on *Valley Drug Company v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir.2003) to support its argument that down-stream discovery is relevant to the DPPs damages, this reliance is misplaced. The undersigned will discuss *Valley Drug Company* in greater detail in the section concerning class certification, but the undersigned notes now that the Eleventh Circuit in *Valley Drug* stated that its holding, which finds down-stream discovery relevant to class certification issues, does not alter the Supreme Court's holding that a direct purchaser's measure of damages is the amount of illegal overcharges, not its lost profits. *See id.* at 1192.

### c. Down–Stream Discovery—Relevancy to DPP Class Certification

Defendants argue vigorously that down-stream discovery is necessary and appropriate to address the question of whether the Court should grant the DPPs' motion for class certification pursuant to Rule 23. Defendants rely on *Valley Drug Company v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir.2003) to support their argument. *Valley Drug* is a case remarkably similar factually to the instant case. The plaintiffs in *Valley Drug* were wholesalers, *i.e.* direct purchasers, of a brand name drug from defendant manufacturers. The plaintiffs alleged that the defendants engaged in conduct which wrongfully delayed entry into the market of the generic form of the drug, thereby injuring them in violation of the Sherman Antitrust Act and the Clayton Act. The defendants contended that some of the direct purchasers had actually benefited from the delayed entry of the generic due to "generic by-pass" and "cost-plus" contracts.

Generic by-pass occurs when retailers skip the wholesaler and go directly to the manufacturer to purchase the generic form of a drug. *Id.* at 1191. A cost-plus contract is one in which wholesalers sell their products on a " 'cost-plus' basis pursuant to which they charge the same percentage mark-up from

their acquisition cost on both branded and generic drugs." *Id.* at 1190. The *Valley Drug* defendants sought down-stream discovery to determine if any other direct purchasers had experienced generic by-pass or had cost-plus contracts. The district court denied defendants' request for down-stream discovery and granted class certification as to the direct purchasers. The Eleventh Circuit reversed and remanded on the ground that downstream discovery should have been allowed as it was relevant to class certification. Specifically, the court found downstream discovery was relevant to the requirement under Rule 23(a)(4) that the representative party in a class action adequately protect the interests of those he purports to represent. *Id.* at 1189. This analysis of adequate representation involves a two part analysis: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Id.* According to the Eleventh Circuit,

> A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class. In such a situation, the named representatives cannot "vigorously prosecute the interests of the class through qualified counsel" because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.

*Id.* at 1189. The *Valley Drug* court held the district court had improperly certified the class of direct purchaser because the defendants were not permitted to conduct discovery to determine whether any members of the putative class had benefited from delayed entry of the generic drug. If they had, then "it is highly likely under such circumstances that the economic interests of these putative class members would be substantially in conflict with the interests of the named representatives who did not experience a net gain from defendant's conduct." *Id.* at 1194. The court summarized, "it would not be difficult to imagine that the national wholesalers, who benefitted from the defendants' conduct, would have substantially different interests and objectives than the named representatives purporting to represent them." *Id.* at

1196. The *Valley Drug* court did not, however, specifically identify what it believed to be the *current* or potential conflict of interest *in the litigation* between those putative members who had experienced a net gain due to defendants' conduct and those who had not. The *Valley* Drug court found its decision to allow down-stream discovery for purposes of class certification did not conflict with the Supreme Court's holdings in *Hanover Shoe* and *Illinois Brick* because neither "addressed a party's burden to satisfy the class certification prerequisites established by Rule 23(a)." *Id.* at 1192.

Neither the Supreme Court nor the Sixth Circuit has examined the *Valley Drug* decision or considered the specific issues raised in *Valley Drug.* Defendants state in their brief that "*Valley Drug*'s reasoning has been adopted by three circuits ... It has also been followed by a court in this District," referring to *In re Southeastern Milk Antitrust Litigation,* 2011 WL 3205798 (E.D.Tenn. July 28, 2011). (Defendants' Response, Page ID # 6614). It is not entirely clear, but the undersigned thinks defendants are referring to the following three circuit court decisions: *Pickett v. Iowa Beef Processors,* 209 F.3d 1276 (11th Cir.2000), another Eleventh Circuit decision like *Valley Drug; Bieneman v. City of Chicago,* 864 F.2d 463 (7th Cir.1988); and *Phillips v. Klassen,* 502 F.2d 362 (D.C.Cir.1974). Of course, since these cases were decided *before Valley Drug,* they could not have "adopted" the reasoning of *Valley Drug,* but they do stand for the general principle that parties who *currently* have disparate economic interests in the same litigation should not be certified as a class.

In *Pickett,* beef cattle producers brought a claim against a slaughterhouse alleging that certain marketing agreements between a slaughterhouse and cattle producers to buy beef cattle constituted an unfair practice in violation of Section 202 of the Packers and Stockyards Act. The *Pickett* court found the district court had properly refused to certify as a single class all cattle producers where some of the producers had benefited from the challenged marketing agreements while others had not. *Pickett,* 209 F.3d at 1280–81. Key to this decision for purposes of this analysis is the fact that, if the marketing agreements were allowed to continue, then some cattle producers would continue to benefit from them while others would not—thus constituting a *current* conflict of interest inherent in the litigation. *Id., see also, Bieneman,* 864 F.2d 463, 464–65 (7th Cir.1988) (holding district court did not abuse discretion in refusing to certify class of property owners near airport in action alleging airport's noise and fumes caused diminution in value of property where some property owners economically benefited from the presence of the airport and some did not); *Phillips v. Klassen,* 502 F.2d 362, 365–68 (D.C.Cir.1974) (holding class of employees given early retirement with a reduced annuity in lieu of possible termination prior to announced reduction-in-force was properly not certified where some of the employees who retired early were satisfied with their early retirement packages and others were not). Finally, the court in *In re Southeastern Milk Antitrust Litigation,* 2011 WL 3205798 (E.D.Tenn. July 28, 2011) cites *Valley Drug* for the general principle that parties with disparate economic interests in litigation should not be certified as one class, a contention with which the undersigned has no quarrel, as shall be discussed.

The *Valley Drug* decision has not been widely embraced. Most courts which have considered the specific issue of down-stream discovery as it relates to class certification in antitrust litigation in the pharmaceutical industry have rejected it. *See e.g., In re Plasma–Derivative Protein Therapies Antitrust Litigation,* 2012 WL 1533221 *2 (N.D.Ill. Apr. 27, 2012) (listing nine cases which have declined to allow down-stream discovery), *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* 246 F.R.D. 293, 303 (D.D.C.2007) (rejecting *Valley Drug* decision on ground it conflicts with the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick* ), *cf. Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l Ltd.,* 247 F.R.D. 253, 268 (D.Mass. 2008) (permitting down-stream discovery pursuant to *Valley Drug* to determine whether a fundamental conflict exists between class members but ultimately finding no conflict of interest where the damages sought far outweighed any benefit gained from defendants' conduct.)

The Third Circuit in *In re K–Dur Antitrust Litigation*, 686 F.3d 197 (3rd Cir.2012) is the only circuit court to examine *Valley Drug*, and it squarely rejected it for two reasons:

> First, requiring plaintiffs to show that no class member benefited from the challenged conduct in the form of greater profits is contrary to the Supreme Court's decision in *Hanover Shoe*. In *Hanover Shoe*, the Supreme Court permitted antitrust plaintiffs to seek overcharge damages rather than lost profits damages precisely because proving lost profits was too complicated and burdensome. 392 U.S. at 493, 88 S.Ct. 2224; *Bogosian* [*v. Gulf Oil Corp.* ], 561 F.2d [434] at 456 [ (3d Cir. 1977) ]. The same logic applies equally, if not more strongly, in the class certification setting because under defendants' proposed approach, plaintiffs would not only have to assess their own lost profits but also those of potential class members. Moreover, because *Hanover Shoe* sets the amount of the overcharge as plaintiffs' damages, all of the class members have the same financial incentive for purposes of the litigation—*i.e.* proving that they were overcharged and recovering damages based on that overcharge. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1768 (3d ed. 2005) ("[A] potential conflict between the representatives and some class members should not preclude the use of the class-action device if the parties appear united in interest against an outsider at the beginning of the case."). Defendants have not pointed to any plausible scenario in which the class members might seek conflicting forms of relief.

*Id.* at 223. The undersigned agrees with the analysis in *K–Dur* and will apply it to the instant case.

■ There may have been an economic conflict of interest among Skelaxin wholesalers *before* generic metaxalone entered the market. *Before* generic metaxalone entered the market, those DPPs who benefitted from selling Skelaxin would have had an interest in delaying entry of generic metaxalone. But generic metaxalone *has* entered the market, and it is not going away. *Currently, in this action*, all DPPs' economic interests in this action are measured in the same way: the difference in the price paid between Skelaxin and generic metaxalone. If damages were measured by the difference in profits attained before and after generic metaxalone entered the market, then defendants' argument would have merit since it would be conceivable that a named plaintiff would have so benefitted from the delayed entry of generic metaxalone into the market that it might not recover anything or very little in this antitrust litigation. In that instance, down-stream discovery would be relevant in considering whether a named plaintiff could adequately and vigorously represent the interests of all members of the class. But, as discussed at length, for various policy reasons, damages in this type of anti-trust litigation are not measured by lost profits; they are measured purely by overcharges, and this fact renders any *past* economic conflict of interest among plaintiffs in this litigation moot as a matter of law. Consequently, to the extent defendants seek down-stream discovery concerning Skelaxin and generic metaxalone for purposes of responding to the DPPs' motion for class certification, the undersigned concludes such information is not relevant and a protective order shall issue.

#### d. *Down-stream Discovery—Relevancy to IPPs' Damages*

■ As previously indicated, defendants also assert down-stream discovery is relevant to the IPPs' damages. Because the IPPs are precluded from bringing a federal antitrust action against the defendants, they have brought antitrust actions against them under state laws. The DPP representatives counter that the defendants can get all the information they need from the IMS Health database and that defendants "have not demonstrated a particularized need for the requested documents and data simply because *indirect* purchaser plaintiffs are also before the Court." (DPPs' Reply, Page ID # 6769) (emphasis original). The undersigned agrees. While the defendants have stated the requested down-stream discovery is relevant to the IPPs' damages, defendants have not discussed or provided any authority concerning how the measure of damages will be calculated under the IPP claims, assuming

the IPPs prevail on their claims. The undersigned is not inherently knowledgeable about such matters and declines to reach its own conclusions without careful briefing. Further, the undersigned wants the defendants to address also why they cannot obtain this information more efficiently from the IPPs themselves and/or from the IMS Health Database. The undersigned will reserve ruling on this issue and give the defendants an opportunity to address these questions.

### 3. Absent DPP Class Members— Request Nos. 6, 7, and 8

█ These requests do not ask for "downstream" discovery. Request No. 6 asks for a list of "all Pharmaceutical Antitrust Litigations, including the name of the case, docket number, the court, and the year the action was filed." (Page ID # 5371). The DPPs challenge the relevancy of this information, assert the request is overly burdensome and oppressive, and aver defendants can obtain the same information from electronic legal research companies. Defendants have not even attempted to articulate the relevancy of this information to the claims or defenses of this particular case or explain why they cannot use one of the legal research databases to find the information they want. A protective order as to the absent members shall be issued.

█ Request No. 7 asks for "[a]ll documents filed by or on behalf of you in support of class certification in any Pharmaceutical Antitrust Litigation, and all drafts, communications, and other documents relating to such documents." In addition to the fact that the latter half of this request is specifically directed toward documents protected by the work product doctrine and the attorney-client privilege, defendants have failed to articulate the relevancy of this information. Moreover, the burden of collecting these documents outweighs any benefit (which has not been articulated by defendants) to the case they might have. A protective order as to the absent members shall be issued.

█ Request No. 8 seeks "[a]ll communications with class counselor [sic] prospective class counsel in any Pharmaceutical Antitrust Litigation, and all documents relating to such communication." Again, this request is pointedly calculated to retrieve documents protected by the work product doctrine and/or the attorney-client privilege. Moreover, it is a hugely broad request as it applies to "all communications" with class counsel in "any Pharmaceutical Antitrust Litigation." Its utility is exceeded by its burdensomeness and oppressiveness. A protective order as to the absent members shall be issued.

### 4. Request No. 1

█ Request No. 1 asks for detailed information from the absent members' electronic databases regarding their purchases of and reimbursements for Skelaxin and generic metaxalone. The DPP plaintiffs object on the ground that the documents' usefulness is outweighed by their burden of production and that the request is duplicative because defendants are already in possession of this information. This information sought is not down-stream discovery; it is relevant to the calculation of the DPPs' damages. However, as the DPP plaintiffs note, it is the defendants who sold Skelaxin and generic metaxalone to the DPP plaintiffs and who gave the DPP plaintiffs reimbursements for the same; therefore, the defendants should already have this information. Defendants do not adequately explain to the undersigned why they need this information from absent DPP class members; nevertheless, the undersigned will reserve ruling on this request and give the defendants an opportunity to explain their need to the undersigned, especially as it relates to the "Big Three wholesalers," McKesson, Cardinal, and ABC. (Defendants' Response, Page ID # 6601.) The court warns simple recitation that other parties have asked for this same information will not suffice; the court can only address what is brought before it. It will be incumbent upon the defendants to explain why they need these records rather than relying on their own records to establish the amount of overcharges, if any, the DPPs paid defendants during the relevant time period.

### IV. Conclusion

For the reasons stated herein, the DPP plaintiffs' motion for a protective order as to

the 25 subpoenas is GRANTED in part, DENIED in part, and RESERVED in part as follows:

(a) for all subpoenas served on nonmembers of the putative DPP class, plaintiffs' motion for a protective order is DENIED,

(b) for all subpoenas served on absent members of the DPP class,

(1) plaintiffs' motion for a protective order is GRANTED as to Request Nos. 5, 9, 10 and 11 (down-stream discovery) to the extent these requests ask for information that relates to pharmaceuticals *other than metaxalone*,

(2) the undersigned RESERVES ruling on the motion for a protective as to Request Nos. 2, 3, 4, 5, 9, 10, and 11 (down-stream discovery) to the extent these requests ask for information concerning metaxalone in order to allow the parties to address more fully the purported need for and relevancy of this information to the IPP class damages issue,

(3) plaintiffs' motion for a protective order is GRANTED as to Request Nos. 6, 7, and 8, and

(4) the undersigned RESERVES ruling on the DPP plaintiffs' motion for a protective order as to Request No. 1.

It is further ORDERED that defendants shall have up to and including **Friday, June 21, 2013** in which to brief the following issues:

(1) why defendants need the information sought from absent DPP class members in Request Nos. 2, 3, 4, 5, 9, 10, and 11 in order to address the Indirect Purchaser's damages rather than relying upon the information obtained from the Indirect Purchasers themselves and/or the IMS Health database, and

(2) why the information sought in request No. 1 is not simply duplicative of the information defendants already have regarding the DPPs' purchases of and reimbursements for Skelaxin and generic metaxalone.

The DPP plaintiffs shall have up to and including **Friday, June 28, 2013** in which to respond. **Briefs may be no longer than seven pages, excluding signatures and the certificate of service. Factual assertions should be supported by appropriate affidavits. The undersigned will not consider any matters outside the two subjects set** forth above. **The parties are ORDERED to meet and confer about these last two issues and to so certify in their briefs.**

SO ORDERED.