Luis ARANAZ and Jared Pereira, individually and on behalf of all others similarly situated, Plaintiffs,

v.

CATALYST PHARMACEUTICAL PARTNERS INC. and Patrick J. McEnany, Defendants.

Case No. 13–cv–23878–UU.

United States District Court, S.D. Florida.

Signed Sept. 29, 2014.

Jayne Arnold Goldstein, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, Weston, FL, Jonathan Horne, Laurence Matthew Rosen, The Rosen Law Firm, New York, NY, for Plaintiffs.

Brian Paul Miller, Ross Elliot Linzer, Samantha J. Kavanaugh, Akerman LLP, Miami, FL, for Defendants.

## *ORDER ON MOTION TO CERTIFY CLASS*

URSULA UNGARO, Judge.

THIS CAUSE comes before the Court upon Plaintiffs' Motion for Class Certification. D.E. 85.

THE COURT has considered the motion and the pertinent portions of the record, and is otherwise fully advised in the premises. The motion has been fully briefed and is ripe for determination.

## BACKGROUND

This case involves claims of securities fraud in violation of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b–5, promulgated thereunder. Specifically, Plaintiffs Luis Aranaz and Jared Pereira allege the following:

On August 27, 2013, Catalyst Pharmaceutical Partners Inc. ("Catalyst") and Patrick McEnany, Catalyst's chief executive, issued a press release stating that a Catalyst drug named Firdapse, which treats Lambert–Eaton Myasthenic Syndrome ("LEMS"), had been designated by the Food and Drug Administration ("FDA") as a Breakthrough Therapy and that there was no effective and available treatment for LEMS. That day, the price of Catalyst common stock soared from $1.42 to $2.01.

However, notwithstanding the representations made in the press release, Amifampridine ("3,4–DAP") was an effective treatment for LEMS, had been available for years and was nearly identical to Firdapse. To boot, it was offered to LEMS patients free of charge. All this was revealed in an article published on October 18, 2013, which sent the price of Catalyst common stock down from $2.61 to $1.90 that day, and then to $1.52 the following day.

Luis Araranaz and Jared Pereira, who each purchased shares of Catalyst common stock following the press release but prior to publication of the revelatory article, and who kept those shares until after that article was published, bring claims of: (1) securities fraud under § 10(b) and Rule 10b–5 against Catalyst and Patrick McEnany; and (2) control liability under § 20(a) against Patrick McEnany. They now move to certify a class consisting of:

> All persons or entities that purchased or otherwise acquired Catalyst Pharmaceutical Partners Inc. securities during the period from August 27, 2013, through October 18, 2013, and who did not sell such securities prior to October 18, 2013, excluding: Defendants, the present and former officers and directors of Catalyst and any subsidiary thereof, members of such excluded persons immediate families and their legal representatives, heirs, successors or assigns and any entity in which any excluded person has or had a controlling interest.

Defendants oppose class certification.

## LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes,* ——U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). A party seeking class certification carries the burden of proving by a preponderance of the evidence that the

action satisfies the prerequisites of Federal Rule of Civil Procedure 23. *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000); *see Messner v. Northshore Univ. HealthSys.,* 669 F.3d 802, 811 (7th Cir.2012) (applying preponderance of the evidence standard); *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir. 2009) (same); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008) (same). A class action may only be certified if the Court finds, after a rigorous analysis, that the prerequisites of Rule 23 have been satisfied. *Gilchrist v. Bolger,* 733 F.2d 1551, 1555 (11th Cir.1984). This analysis frequently entails some overlap with the merits of the underlying claims. *Wal–Mart Stores, Inc.,* 131 S.Ct. at 2551–52 ("[C]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotations omitted). Thus, though "a court should not determine the merits of a case at the class certification stage, the court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be certified." *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1188 n. 15 (11th Cir.2003); *see also Hudson v. Delta Air Lines,* 90 F.3d 451, 457 (11th Cir.1996) ("[I]t is sometimes necessary to probe behind the pleadings before coming to rest on the certification question." (quoting *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982))).

Even where there is no opposition to class certification, a court nevertheless has the responsibility of determining whether the requirements of Rule 23 have been satisfied. *Valley Drug Co.,* 350 F.3d at 1188. Further, even where the movant makes a strong showing that class certification is proper, the Court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 (11th Cir.1992).

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh

## ANALYSIS

To show that class certification is appropriate under Rule 23, the party seeking class certification must show that the action satisfies the standards of both Rule 23(a) and 23(b). *Turner v. Beneficial Corp.,* 242 F.3d 1023, 1025 (11th Cir.2001). The Court will consider each in turn.

*Rule 23(a)*

To satisfy Rule 23(a), the party moving for class certification must show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). These four prerequisites are commonly referred to as "numerosity," "commonality," "typicality," and "adequacy of representation." *Valley Drug Co.,* 350 F.3d at 1188. Additionally, the movant must show that the proposed class is "adequately defined and clearly ascertainable." *See, e.g., DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.").[1] While Defendants concede that this action satisfies Rule 23(a), the Court must nevertheless conduct its own inquiry.

*Class Definition*

■ Plaintiffs propose a class consisting of:

All persons or entities that purchased or otherwise acquired Catalyst Pharmaceutical Partners Inc. securities during the period from August 27, 2013, through October 18, 2013, and who did not sell such securities prior to October 18, 2013, excluding: Defendants, the present and former officers and directors of Catalyst and any subsidiary thereof, members of such

Circuit adopted as binding the decisions of the Fifth Circuit issued prior to October 1, 1981.

excluded persons' immediate families and their legal representatives, heirs, successors or assigns and any entity in which any excluded person has or had a controlling interest.

This definition is overbroad.

■ To succeed on a private securities fraud claim under Rule 10b–5, a plaintiff must prove, *inter alia*, reliance on the misrepresentation. *E.g. Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–41, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Intuitively, a person who did not make the decision to acquire a security could not have relied on a prior misrepresentation. Accordingly, the class definition will be limited to those who *purchased* Catalyst securities during the class period.[2]

Further, to avoid conflicts of interest among the class members, the class will exclude all entities affiliated with Catalyst. And lastly, for reasons addressed later in this Order, the definition will also be limited to those who purchased Catalyst *common stock* during the class period. Accordingly, the Court will consider the propriety of class certification with reference to the following class definition:

> All persons or entities that purchased Catalyst Pharmaceutical Partners Inc. common stock during the period from August 27, 2013, through October 18, 2013, and who did not sell such securities prior to October 18, 2013, excluding: Defendants; any entities affiliated with Catalyst; the present and former officers and directors of Catalyst or any subsidiary or affiliate thereof; members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any excluded person has or had a controlling interest.

*Numerosity*

■ To satisfy the numerosity requirement of Rule 23(a)(1), a movant must show

that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Generally, joinder of fewer than twenty-one plaintiffs is considered practicable and joinder of more than forty impracticable. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986). However, the number of putative class members is not necessarily determinative; because the focus of Rule 23(a)(1) is practicability of joinder, other relevant factors include "geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981).

■ Securities fraud actions predicated on public misrepresentations typically satisfy Rule 23(a)(1) where the securities were traded on a national public exchange, as the putative class members are likely to be numerous, geographically dispersed and difficult to identify. *Id.* at 1039; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D.Fla. 2003); *see also See Evans v. United States Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983) (courts may make common sense assumptions in assessing practicability of joinder). And while it is often difficult in such cases to ascertain the precise number of putative class members, failure to determine the exact size of a putative class does not preclude class certification. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir.2009).

■ In this case, over 110 million shares of Catalyst common stock exchanged hands during the class period. Feinstein Report at Exhibit 4, D.E. 86–1. Further, while there were roughly 51.7 million shares of Catalyst common stock outstanding during this period, approximately 43.2 million of those shares were owned by investors who were neither Catalyst insiders nor entities affiliated with Catalyst, both of which are excluded from the proposed class. *Id.* at ¶¶ 60, 61, 71. And

---

2. Even assuming *arguendo* that certain putative class members who acquired Catalyst securities by means other than purchase could nonetheless prove reliance, a class consisting of all who acquired Catalyst stock by any means (including gift or bequest) would be overbroad.

because Catalyst's twenty-four large institutional investors collectively owned only about 8 million shares of Catalyst common stock, roughly 35 million shares were owned by what is likely to be a legion of less substantial investors, who were neither Catalyst insiders nor Catalyst affiliates. *Id.* at ¶¶ 49, 50. Thus, a substantial portion of the more than 110 million shares of Catalyst common stock traded during the class period likely were exchanged between a magnitude of investors not excluded from the class.

Finally, because Catalyst common stock trades on the NASDAQ Stock Market, a national public exchange, it is likely that the putative class members are geographically diverse and difficult to identify. In consideration of these undisputed facts, Plaintiffs show that joinder of the putative class members would be impracticable.

*Commonality*

■ To satisfy the commonality requirement of Rule 23(a)(2), a movant must show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Where a movant moves to certify a class under Rule 23(b)(3), as Plaintiffs do here, the commonality requirement "is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions"; while commonality requires only that common questions exist, predominance requires both that common questions exist and that those questions predominate over questions requiring individualized proof. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997) ("The predominance inquiry ... is far more demanding than Rule 23(a)'s commonality requirement.") (internal quotations and citations omitted). Suffice it to say, the proposed class action presents several common issues, which will be identified and discussed

in the Court's predominance analysis. Accordingly, Plaintiffs show that this action presents common questions of fact and law.

*Typicality*

■ To satisfy the typicality requirement of Rule 23(a)(3), a movant must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality does not require that the claims of the class representative be identical to those of the class at large, but only that they arise from the same event, pattern or practice and be based on the same legal theory. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984). Generally, a class representative must possess the same interest and suffer the same injury as the class members for his claims to be typical. *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir.2004) (internal citation omitted). Factual variations will not render a class representative's claims atypical so long as those claims share "the same essential characteristics as the claims of the class at large." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n. 14 (11th Cir.2000) (quoting *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985)); *see also Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir.2001) ("The typicality requirement may be satisfied despite substantial factual differences.").

The claims of Luis Aranaz and Jared Pereira, the proposed class representatives, are typical of those of the class; they each allege that in purchasing Catalyst common stock,[3] they relied to their detriment on Defendants' August 27, 2013, fraudulent misrepresentation that there was no effective and available treatment for LEMS. Thus, their claims arise from the same event, are based on the same legal theory and share the same essential characteristics. And to the Court's knowledge, Defendants possess no defenses unique to the claims of either Luis Aranaz or

---

**3.** The Catalyst securities purchased by Luis Aranaz and Jared Pereira during the class period were shares of common stock. Aranaz Affidavit

at ¶ 6, D.E. 14–2; Pereira Affidavit at ¶ 6, D.E. 14–2.

Jared Pereira. *See Ross v. Bank S., N.A.,* 837 F.2d 980, 990–91 (11th Cir.1988). Accordingly, Plaintiffs show their claims to be typical of those of the class.

*Adequacy of Representation*

▮▮▮▮ To satisfy the adequacy of representation requirement of Rule 23(a)(4), a movant must show that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement encompasses two separate inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir.2003) (quoting *In re HealthSouth Corp. Sec. Litig.,* 213 F.R.D. 447, 460–461 (N.D.Ala.2003)). A plaintiff should not represent a class if there exist any fundamental conflicts of interest, such as where conduct relevant to the controversy benefitted the plaintiff but harmed other class members. *Id.* Additionally, a plaintiff should not represent a class if he is not willing to vigorously litigate the action. *See Collins v. Erin Capital Mgmt., LLC,* 290 F.R.D. 689, 697 (S.D.Fla.2013).

Here, there are no apparent fundamental conflicts of interests among the putative class members; present and former Catalyst insiders, those related to such insiders and entities affiliated with Catalyst are all excluded from the class definition. Further, the claims of the putative class members, including those of the proposed class representatives, appear to be quite similar. This alignment of interests provides a strong incentive for the proposed class representatives to prosecute with vigor. Accordingly, Plaintiffs show that Luis Aranaz and Jared Pereira would fairly and adequately represent the class while protecting the interests of its members.

Plaintiffs have shown that this action satisfies Rule 23(a), and Defendants do not argue otherwise. Accordingly, the Court must now assess whether Plaintiffs have similarly shown that this action satisfies Rule 23(b).

*See Halliburton Co. v. Erica P. John Fund, Inc.,* —— U.S. ——, 134 S.Ct. 2398, 2412, 189 L.Ed.2d 339 (2014) (noting that Rule 23(b) is usually determinative with securities fraud actions).

*Rule 23(b)*

To satisfy Rule 23(b), a movant must show that the action satisfies at least one of three alternative standards. *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1279 (11th Cir. 2000). Plaintiffs move for class certification under Rule 23(b)(3), under which certification is appropriate only if: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The so-called "predominance" and "superiority" requirements are meant to ensure that proceeding as a class will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (internal quotations omitted). The parties dispute whether this action satisfies these requirements.

*Predominance*

▮▮▮▮ To satisfy the predominance requirement of Rule 23(b)(3), a movant must show that issues subject to generalized proof, which are applicable to the putative class members equally, predominate over issues requiring individualized evidence. *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997) (quoting *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1557–58 (11th Cir.1989)). It is not necessary that all questions of fact or law be common; it is enough that there exist some common questions and that they predominate over individual questions. *Klay v. Humana, Inc.,* 382 F.3d 1241, 1254 (11th Cir.2004). Because predominance turns on the nature of the legal and factual issues presented, an understanding of the underlying claims and the

types of evidence they require is essential. *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) ("Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action.") (internal quotations omitted).

 To succeed on a claim of control liability under § 20(a), a plaintiff must prove that the defendant: (1) had the power to control the general affairs of the entity primarily liable for securities fraud at the time of the violation; and (2) had the power to control or influence the specific corporate policy that resulted in primary liability. *Brown v. Enstar Grp., Inc.,* 84 F.3d 393, 396 (11th Cir.1996). This claim only presents questions related to the extent and nature of Patrick McEnany's control over Catalyst, which are plainly issues subject to generalized proof. Thus, Plaintiffs' § 20(a) claim is no barrier to class certification, and Defendants do not argue otherwise. However, whether common questions presented by Plaintiffs' Rule 10b–5 claims also predominate is a more difficult question.

 To succeed on a private claim of securities fraud under § 10(b) and Rule 10b–5, a plaintiff must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, otherwise known as "loss causation." *E.g. Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–41, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Plaintiffs' Rule 10b–5 claim presents several common issues, including: whether Defendants made a misleading statement, whether that statement was material, whether Defendants made that statement with scienter and whether Defendants made that statement in connection with the purchase or sale of securities. Further, even though the elements of

"economic loss" and "loss causation" may require individualized proof, courts generally focus on issues related to liability in determining predominance. *See, e.g., Allapattah Servs., Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261 (11th Cir.2003) ("Numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); *In re Alexander Grant & Co. Litig.,* 110 F.R.D. 528, 534 (S.D.Fla.1986) ("Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions.") (quoting *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 93 (S.D.N.Y. 1981)).

Thus, as is typical with private securities fraud claims predicated on public statements, whether common issues predominate in this case depends on whether the issue of reliance will require individualized proof. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1193, 185 L.Ed.2d 308 (2013) ("Absent [a presumption of reliance], the requirement that Rule 10b–5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."); *Erica P. John Fund, Inc.,* 131 S.Ct. at 2184 ("Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance.").

 The traditional means by which plaintiffs prove reliance—proving knowledge of the misrepresentation and a transaction based on that misrepresentation—requires individualized evidence. *Amgen Inc.,* 133 S.Ct. at 1192 (quoting *Erica P. John Fund, Inc.,* 131 S.Ct. at 2185). However, plaintiffs who purchase securities on a well-developed and efficient market, in which price generally reflects all public information, following a public and material misrepresentation are presumed to have relied on that misrepresen-

tation. *Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Where this presumption applies, plaintiffs need not show individualized reliance. In fact, this legal presumption was created in part because requiring plaintiffs to prove individualized would effectively preclude class certification under 23(b)(3) for want of predominance. *Amgen Inc.,* 133 S.Ct. at 1192 (quoting *Erica P. John Fund, Inc.,* 131 S.Ct. at 2185). The presumption of reliance, however, is not automatic.

**Entitlement to the Presumption of Reliance**

▮ Generally, to invoke the presumption of reliance, a plaintiff must show that: (1) the misrepresentation was material; (2) the misrepresentation was publicly known; (3) the plaintiff traded the security after the misrepresentation was made public but before the truth was revealed; and (4) the security traded in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.,* —— U.S. ——, 134 S.Ct. 2398, 2408, 189 L.Ed.2d 339 (2014). However, to avoid prematurely plunging too deep into the merits, a plaintiff's burden at the class certification stage is more modest. Specifically, because materiality is an essential element of a Rule 10b–5 claim, and because a finding of immateriality would thus dispose of this litigation and moot any individual issues, a plaintiff need not show materiality at the class certification stage. *Amgen Inc.,* 133 S.Ct. at 1195–96. Relatedly, because revelation of the truth renders a misrepresentation immaterial going forward, a plaintiff need not show at the class certification stage that he purchased the security before the truth was revealed. *See, e.g., Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir.2000) (Katzmann, J.) ("[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."); *Provenz v. Miller,* 102 F.3d 1478, 1492 (9th Cir.1996) ("[A]n omission is materially misleading only if the information has not already entered the market.") (internal quotations omitted); *see also*

*Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding that true statements may discredit a previous material misrepresentation such that the risk of deception decreases to the point that the misstatement is immaterial). Accordingly, to prove entitlement to a presumption of reliance at the class certification stage for purposes of showing the predominance of common issues, a plaintiff need only show that: (1) the alleged misrepresentation was publicly known before the plaintiff traded the security; and (2) the security traded in an efficient market.

▮ Plaintiffs show that the alleged misrepresentation was contained in a Catalyst press release, which was the topic of several financial reports and news articles, and thus show that the misrepresentation was publicly known. Similarly, Plaintiffs show that Catalyst common stock traded in an "efficient market" during the proposed class period.

Market efficiency refers to the extent to which, and speed with which, the market for a particular security reacts to new information by incorporating that information into its valuation of the security. Intuitively, then, the efficiency of any particular market largely depends on the extent of investor interest in that security. The Supreme Court has yet to give any real guidance as to how to determine market efficiency, and the Eleventh Circuit has declined so far to adopt any particular test or approach. *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.,* 762 F.3d 1248, 1255–56 (11th Cir.2014). Nevertheless, Eleventh Circuit precedent affords considerable guidance.

In *FindWhat Investor Grp. v. FindWhat.com,* the Eleventh Circuit noted that high-volume trading activity and a presence of "market makers," market intermediaries who trade based upon current information, generally render a market efficient. 658 F.3d 1282, 1310 (11th Cir.2011); *see also Local 703, I.B. of T. Grocery & Food Employees Welfare Fund,* 762 F.3d at 1255 (not-

ing that "high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information" is a common trait of an efficient market). More recently, in *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.,* the Eleventh Circuit held that a market was efficient where: (1) millions of shares of the stock traded daily; (2) the stock traded on the New York Stock Exchange, a national public exchange; (3) twenty-nine financial analysts covered the stock during the class period; (4) the company was eligible to file a Form S–3 with the Securities and Exchange Commission ("SEC");[4] and (5) institutional investors during the class period ranged from 329 to 425. 762 F.3d at 1257–58. Importantly, the Court also cited approvingly to the indicators of market efficiency identified in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). *Id.* Those indicators are: (1) a high average trading volume; (2) the presence of numerous financial analysts following the company and reporting on the stock; (3) the presence of market makers; (4) SEC Form S–3 eligibility; and (5) any empirical evidence that unexpected events or information cause immediate changes in stock price. *Cammer,* 711 F.Supp. at 1286–87.

Here, the undisputed facts make clear that Catalyst common stock traded in an efficient market during the class period. An average of 3.1 million shares of Catalyst common stock traded during the class period on a daily basis, which amounted to an average weekly trading volume of 15.8 million shares. Feinstein Decl. at ¶¶ 43, 44. Further, during the class period, there were at least forty-seven Catalyst common stock market makers and at least four different securities analysts following Catalyst. *Id.* at ¶¶ 47, 55. And that Catalyst traded on the NASDAQ Stock Market, a national public exchange, and was eligible to file an SEC Form S–3 further evidences market efficiency. *Id.* at ¶¶ 53, 59. Lastly, it is undisputed that the August 27, 2013, press release caused the price of Cata-

lyst common stock to surge by 42% that day, and that the October 18, 2013, article caused a 42% price decline over two days. Both the extent and the immediacy of this price impact serve as strong empirical evidence of market efficiency. Accordingly, based on the evidence presented, the Court finds that Catalyst common stock traded in an efficient market during the class period.

■ However, most of Plaintiffs' evidence sheds no light on whether other types of Catalyst securities, such as preferred stock or debt, also traded in an efficient market during the class period. Plaintiffs thus fail to show that those who purchased these other types of Catalyst securities will be entitled to a presumption of reliance. Accordingly, because including such persons in the class could create numerous substantial questions of reliance that require individualized proof, the class will be limited to those who acquired Catalyst *common stock* during the class period. *See Schleicher v. Wendt,* 1:02–CV–1332–DFH–TAB, 2009 WL 761157, at *1 (S.D.Ind. Mar. 20, 2009) *aff'd,* 618 F.3d 679 (7th Cir.2010) (including in the class only buyers of common stock because the plaintiffs did not show that other securities traded in an efficient market).

Though Plaintiffs have shown that purchasers of Catalyst common stock will be entitled to a presumption of reliance, a point which Defendants do not dispute, that presumption is rebuttable. Defendants attempt to rebut that presumption.

### Rebutting the Presumption of Reliance ·

■ The presumption of reliance is comprised of two constituent presumptions: (1) that the public and material misrepresentation impacted the price of the security because it was traded in an efficient market; and (2) that the plaintiff purchased the security in reliance on his belief that the market's valuation of the security would not reflect fraudulently disseminated misinformation. *Halliburton Co. v. Erica P. John Fund, Inc.,*

---

4. Satisfaction of the prerequisites to Form S–3 eligibility, which include certain minimum trad-

ing requirements, implies that the company is well-known in the marketplace.

— U.S. ——, 134 S.Ct. 2398, 2414, 189 L.Ed.2d 339 (2014). These presumptions, however, are based on faulty rationales.

The first constituent presumption is predicated on the efficient capital markets hypothesis, which posits that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic Inc. v. Levinson,* 485 U.S. 224, 241, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–1161 (3d Cir.1986)). Under this hypothesis, market valuations in efficient markets reflect all public information and will be impacted whenever that public information is also material. Thus, theoretically, where public and material information is erroneous, the misinformation has some impact on stock price such that the fraud is "on the market." However, in reality, "[t]he markets for some securities are more efficient than the markets for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood." *Halliburton Co.,* 134 S.Ct. at 2409. Thus, even in a generally efficient market, the market value of a security might not reflect all public misrepresentations. *Id.* at 2410 (noting that the presumption of reliance is not based on the infallibility of the efficient capital markets hypothesis, but rather on "the fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices") (internal quotations omitted).

The second constituent presumption is predicated on what the Supreme Court considered to be a common-sense assumption that investors, in purchasing securities, rely on market integrity. *Basic Inc.,* 485 U.S. at 246–47, 108 S.Ct. 978 ("[I]t is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" (quoting *Schlanger v. Four–Phase*

*Sys. Inc.,* 555 F.Supp. 535, 538 (S.D.N.Y. 1982))). However, the Supreme Court has since conceded that not all investors rely on market integrity in purchasing securities. *Halliburton Co.,* 134 S.Ct. at 2411 ("*Basic* concluded only that it is reasonable to presume that *most* investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information.") (internal quotations omitted).

■■■■ Because both presumptions have been found inconclusive, a defendant may refute the presumption of reliance by rebutting either constituent presumption by a preponderance of the evidence. *See Basic Inc.,* 485 U.S. at 248, 108 S.Ct. 978 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."). Additionally, the first presumption—that the public and material misrepresentation impacted the price of the security because it was traded in an efficient market—may be rebutted at the class certification stage so as to show that common issues do not predominate. *See Halliburton Co.,* 134 S.Ct. at 2417. However, while the presumption of price impact may be rebutted at the class certification stage by directly showing an absence of price impact, it may not be indirectly rebutted by showing that the misrepresentation was immaterial. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* — U.S. ——, 133 S.Ct. 1184, 1197, 185 L.Ed.2d 308 (2013). So long as adequately plead, all alleged misrepresentations must be assumed to be material at the class certification stage.

Defendants attempt to rebut the presumption of reliance by showing that the alleged misrepresentation had no impact on the price of Catalyst common stock. In support of this contention, Defendants rely largely on the argument that the truth—that 3,4–DAP was

an effective and available treatment for LEMS—was already known to the public and that the alleged misrepresentation therefore could not have impacted the price of Catalyst common stock. This argument, known as the "truth-on-the-market" defense, is a corollary of the fraud-on-the-market theory of liability and similarly relies on the efficient capital markets hypothesis. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("[A] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known."); *cf. Basic Inc.*, 485 U.S. at 248, 108 S.Ct. 978 (noting that the presumption of reliance in a fraud-on-the-market case may be rebutted by showing that "the 'market makers' were privy to the truth").

■■ However, a truth-on-the-market defense may not be used at the class certification stage to prove an absence of price impact so as to show a lack of predominance because it goes to materiality; as previously stated, the truth's presence on the market renders an alleged misrepresentation immaterial. *See, e.g., Ganino*, 228 F.3d at 167 ("[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.") (Katzmann, J.); *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir.1996) ("In a 'fraud on the market' case an omission is materially misleading only if the information has not already entered the market.") (internal quotations omitted); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding that true statements may discredit a false statement such that the risk of deception decreases to the point that the misstatement is immaterial). That the "truth-on-the-market" defense goes to materiality is readily apparent when the argument is deconstructed. In arguing that the truth's presence on the market precludes price impact, Defendants rely on the validity of the efficient capital markets hypothesis and assume that Catalyst common stock traded in an informationally efficient market such that

the price of Catalyst stock was impacted by all public and material information. And because the market's knowledge of the truth has no bearing on whether the alleged misrepresentation was publicly known, the "truth-on-the-market" defense, stripped down, is merely an argument that the alleged misrepresentation was immaterial in light of other information on the market.

Here, because Defendants argue that the truth was on the market before the class period began, Defendants' succeeding with their truth-on-the-market defense would defeat materiality as to every putative class member and would thus end this controversy in its entirety. Plaintiffs concede this point, and Defendants offer no dispute. Accordingly, for purposes of determining at this early stage in litigation whether the alleged misrepresentation had any impact on the price of Catalyst stock, the Court must disregard evidence that the truth was known to the public. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, —— U.S. ——, 133 S.Ct. 1184, 1203, 185 L.Ed.2d 308 (2013) (holding that the district court did not err by disregarding the defendant's truth-on-the-market defense at the class certification stage, which was proffered to rebut the presumption of price impact so as to show that class certification was improper for lack of predominance). That issue, instead, is a matter for trial or for summary judgment. *Id.* at 1204.

■■ Defendants, however, proffer alternative evidence that their alleged misrepresentation had no price impact. Conceding that the press release containing the alleged misrepresentation caused the price of Catalyst stock to spike and that the article revealing the misrepresentation caused the price of Catalyst stock to drop, Defendants argue that other representations contained in those two publications caused the drastic changes in stock price. Specifically, Defendants assert that the truthful announcement in the press release that Firdapse received Breakthrough Therapy designation fully accounts for the 42% spike in stock price and that bad publicity and market overreaction from the

October 18, 2013, article, which painted Catalyst as greedy corporation apathetic to the plight of LEMS patients, fully account for the 42% decline.

In supporting their argument that the 42% price spike was fully attributable to the accurate announcement of Firdapse's Breakthrough Therapy status, Defendants focus on the importance of that announcement to Catalyst investors. In designating Firdapse as a Breakthrough Therapy, the FDA determined, based on preliminary clinical evidence, that Firdapse could be a substantial improvement over available LEMS treatments. But perhaps more importantly for Catalyst investors, Firdapse's status as a Breakthrough Therapy would allow for expedited development and review of the drug, which to date has yet to receive FDA approval. According to Defendants, the relative importance of Firdapse's Breakthrough Therapy status is buttressed by the fact that: (1) both financial analyst reports issued following the press release focused on Firdapse's Breakthrough Therapy status and both ignored the alleged misrepresentation; (2) one financial analyst raised its target price for Catalyst common stock following the press release and explicitly credited this change to Firdapse's being designated as a Breakthrough Therapy; and (3) articles published in news outlets following the press release focused on Firdapse's Breakthrough Therapy status. Allen Report ¶¶ 45, 46, 50, Exhibits 8, 14–17. But even assuming *arguendo* that the announcement of Firdapse's Breakthrough Therapy designation was substantially more important than the alleged misrepresentation that there existed no effective and available treatment for LEMS, it does not follow that the misrepresentation did not account for any of the 42% spike in stock price.

For similar reasons, Defendants' parallel argument that bad publicity and market overreaction from the October 18, 2013, article fully accounted for the 42% decline in stock price also fails. While the article painted Catalyst as a villain for its plan to charge for Firdapse notwithstanding that LEMS patients had effectively been receiving the drug free of charge, and while bad press and market overreaction may have affected Catalyst's stock price,[5] it does not follow that the revelation of 3,4–DAP as an effective and available alternative to Firdapse did not also contribute to the 42% fall in stock price. Thus, notwithstanding that the commentary following the article focused on Catalyst's greed, and notwithstanding that the article did not cause any analysts to lower their target price of Catalyst stock, Defendants have not shown that the revelation of 3,4–DAP as an effective and available alternative to Firdapse had no negative impact on the price of Catalyst stock.

Lastly, Defendants proffer expert testimony that the increase in Catalyst's market capitalization immediately following the press release is "fully consistent" with the rise in market capitalization of the twenty-two other companies that have announced Breakthrough Therapy designation. Allen Report ¶¶ 52–58. Even ignoring the obvious weaknesses in the methodology of the analysis as it relates to whether the alleged misrepresentation had a price impact, the conclusion derived from that analysis falls short. Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient. For these reasons, Defendants fail to show that the alleged misrepresentation did not at all contribute to the 42% spike in the price of Catalyst common stock on August 27, 2013.

Further, even assuming *arguendo* that Defendants had shown the August 27, 2013,

---

**5.** It is not clear whether market overreaction had any impact on Catalyst's stock price; the price of Catalyst stock did not recover in the days or months following the publication of the article, and neither expert conducted any of the accepted quantitative analyses used to determine whether price movements were caused by market overreaction. Horne Decl., Exhibit 9; Allen Dep. at 78:22–80:12.

price spike to be wholly caused by the truthful announcement of Firdapse's Breakthrough Therapy designation, it is still possible that the alleged misrepresentation offset some unexpected event or information that would have negated to some extent the market effect of Breakthrough Therapy status. *See e.g., In re Scientific–Atlanta, Inc. Sec. Litig.,* 571 F.Supp.2d 1315, 1340–41 (N.D.Ga. 2007) ("[T]he mere absence of a statistically significant *increase* in the share price in response to fraudulent information does not "sever the link" between the material misstatements and the price of the stock ... [because] price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not."); *In re Vivendi Universal, S.A. Sec. Litig.,* 765 F.Supp.2d 512, 562 (S.D.N.Y.2011) ("[A] statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value."). Notwithstanding that Defendants have the burden of rebutting the presumption of price impact, their briefing does not even attempt to show that there were no unexpected events negatively affecting Catalyst's stock price on August 27, 2013. And by failing to show an absence of these other factors, which might have been offset by the alleged misrepresentation, Defendants fail to show an absence of price impact.

Under the framework espoused by the Supreme Court, once a plaintiff shows entitlement to a presumption of reliance, the defendant is burdened with the daunting task of proving that the publicly known statement had no price impact. *Halliburton Co. v. Erica P. John Fund, Inc.,* —— U.S. ——, 134 S.Ct. 2398, 2417, 189 L.Ed.2d 339 (2014) (Ginsburg J., concurring) ("[T]he Court recognizes that it is incumbent upon the defendant to show the absence of price impact. The Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims.") (internal citations omitted); *Id.* at 2424 (Thomas, J., dissenting) ("[I]n practice, the so-called 'rebuttable presumption' is largely irrebuttable."); *Schleicher v. Wendt,* 618 F.3d 679, 681 (7th Cir.2010) (Easterbrook, J.) ("When a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action."). Here, Defendants' burden is particularly onerous; not only is there a clear and drastic spike following the alleged misrepresentation and an equally dramatic decline following the revelation of the truth, but all agree that the publications containing the misrepresentation and its revelation respectively caused those price swings. Under these circumstances, proving an absence of price impact seems exceedingly difficult, especially at the class certification stage in which it must be assumed that the alleged misrepresentation was material. And for the reasons previously stated, Defendants here do not meet this burden. Accordingly, because Plaintiffs show a preliminary entitlement to the presumption of reliance and because Defendants fail to rebut that presumption, Plaintiffs have met their burden of showing that reliance will be a common issue and that common issues therefore will predominate.

*Superiority*

To satisfy the superiority requirement of Rule 23(b)(3), a movant must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,* 601 F.3d 1159, 1183–84 (11th Cir.2010) (quoting *Klay v. Humana, Inc.,* 382 F.3d 1241, 1269 (11th Cir.2004)). Matters pertinent to superiority include: "(1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely

difficulties in managing a class action." Fed. R.Civ.P. 23(b)(3). Here, it is clear that a class action is superior to other available methods for the fair and efficient adjudication of this controversy.[6]

■ Class treatment is often the best method for resolving securities fraud claims predicated on public misrepresentations. *See, e.g., In re AmeriFirst Sec. Litig.,* 139 F.R.D. 423, 427 (S.D.Fla.1991) ("It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions."). This case is no exception. To the Court's knowledge, there is no reason why the putative class members might have a special interest in controlling their claims. To the contrary, it appears that putative plaintiffs would favor class treatment on account of the abundance and importance of common issues in this case, which render class treatment more cost-effective and which diminish the traditional difficulties of proceeding as a class. *See Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class because it saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23.") (internal quotations omitted); *Sacred Heart Health Sys., Inc.,* 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.") (internal quotations omitted). Further, it is likely that many of the less substantial investors belonging to the class would forego their claims for lack of

incentive if forced to prosecute individually. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (internal quotations omitted); *Sacred Heart Health Sys., Inc.,* 601 F.3d at 1184 (considering class members' individual stakes in the litigation in determining superiority). Lastly, the Court is aware of no other litigation concerning this controversy, and to the Court's knowledge, the Southern District of Florida, being the district in which Catalyst maintains its corporate headquarters, is as desirable a venue as any. For these reasons, the Court finds that a class action is superior to other available methods for the fair and efficient resolution of this action. Accordingly, class certification is warranted under Rule 23.

## CONCLUSION

In accordance with the foregoing, it is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion for Class Certification, (D.E. 85), is GRANTED IN PART and DENIED IN PART. The Court hereby certifies the following class:

> All persons or entities that purchased Catalyst Pharmaceutical Partners Inc. common stock during the period from August 27, 2013, through October 18, 2013, and who did not sell such securities prior to October 18, 2013, excluding: Defendants; any entities affiliated with Catalyst; the present and former officers and directors of Catalyst or any subsidiary or affiliate thereof; members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any excluded person has or had a controlling interest.

---

6. Defendants' only challenge to superiority is based on their previously rejected argument that

reliance will have to be individually proven regardless of whether the class is certified.

Additionally, the Court hereby appoints Luis Aranaz and Jared Pereira as the class representatives and The Rosen Law Firm, P.A. as class counsel. Further, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion for a Hearing, (D.E. 95), is DENIED AS MOOT. Lastly, it is hereby

ORDERED AND ADJUDGED that the Joint Motion to Extend Discovery and to Continue Pretrial Deadlines, (D.E. 100), is GRANTED IN PART and DENIED IN PART in accordance with a forthcoming amended Trial Order.